[Crim. No. 17182. First Dist., Div. Four. June 26, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNNY ALFRED GUILLEBEAU, Defendant and Appellant.

536

538

COUNSEL

Johnny Alfred Guillebeau, in pro. per., Douglas R. Schmidt, under appointment by the Court of Appeal, and Winslow & Schmidt for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, John T. Murphy, Derald E. Granberg and John H. Sugiyama, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CALDECOTT, P. J.**—Appellant, Johnny Alfred Guillebeau was convicted, following a jury trial, of murder first degree, attempted murder, rape and burglary first degree. The jury also found that appellant inflicted great bodily injury on his victim during the rape and the burglary.

Appellant moved for a new trial, or in the alternative, for the reduction of the murder verdict to the second degree. The court denied both aspects of the motion. The court then sentenced appellant to prison for the terms prescribed by law. In so doing, the court ordered the following: that the sentence for the rape count be served consecutively to the sentence for the murder count; that the sentences on the attempted murder and the burglary counts be stayed; and that the sentences for the great bodily injury findings be served consecutively to the sentence on the last count to be served.

Timely notice of appeal was filed on July 8, 1977.

On October 7, 1976, Linda Shepherd was living with her two young daughters in a second floor unit of a four-unit apartment building in the City of Richmond. Early that evening, Linda fed her younger daughter, four-month-old Sheila Louise Echols Goshen, and put her to bed in the crib. Then, after completing the rest of her housekeeping responsibilities, Linda and her other daughter, three-and-a-half-year-old Carla Williams, watched television in the bedroom, and eventually fell asleep together between 10 and 11 p.m. At that point, a light was still on in the bedroom, and another was on in the kitchen. The window by the living room was left open about six inches. A slightly bent screen was on the outside of the window. Curtains were hanging straight down on the outside of the window.

Between 2:30 and 3 a.m., Linda awoke when she felt tapping on her shoulder. An intruder, later identified as Johnny Guillebeau, had a knife to her throat, and said, "Hey, keep it cool; keep it cool." As he said this, he motioned toward Carla, who had awakened and had begun to cry. He warned Linda that he would cut Carla's throat if she cried. In response, Linda calmed Carla to avoid any harm to the child. When Linda had quieted down the little girl, appellant led Linda to the living room.

Once in the living room, appellant ordered Linda to disrobe, and when she refused, appellant took off her clothes. Immediately, Linda started to scream, and appellant threatened, "keep quiet, or I'll cut your throat." With that, he forced her onto the couch and raped her. When he finished his sexual assault, appellant got astride Linda and, with both hands grasping his knife, appellant stabbed her in the middle of the neck with the dull blade. Following this, he successively thrust twice more into her throat and tried to slash her from the vagina upwards but apparently the knife was too dull to cut the flesh.

Linda pretended to die from these wounds. When appellant turned away and started walking toward the bedroom where Carla was placed, Linda rushed toward him and hit him in the face. He struggled with her. He hit her, and knocked her onto the couch, and then stood on the coffee table and kicked her in the face. He cut her finger with the knife during this struggle. He then jumped up on a couch and leaped through the window in the living room. She looked out the window after him and saw him running down the steps and away.

Once appellant was gone, Linda tried to contact a friend or her neighbors for help. Finally, on the third try, she reached the woman who lived next to her and had the neighbor call the police.

A number of officers from the Richmond Police Department quickly responded, and one officer called an ambulance. Officer Larry Brady, one of the first officers to arrive, saw Linda with extensive amounts of blood covering her robe, her throat, and her hands. Inside the apartment, Brady found a blood stain on the couch. He noticed shoe impressions left in blood around the coffee table and observed that the screen that should have covered the living room window was missing and that the curtain in front of the window, rather than hanging straight down, was resting over the couch.

While Brady was examining the scene, an ambulance crew arrived to take Linda to the hospital. Before she was taken away, Linda repeatedly asked who would care for the baby. Officer Brady, thinking she meant Carla, who was crying nearby, responded that the child was alright and would be taken care of.

Shortly thereafter, Girthy Litt, a neighbor, walked into the apartment. Brady asked where she was going. The woman answered that she was going to get Linda's baby. Brady inquired as to where the baby was

and she pointed to a bedroom in the back. The officers began to understand that there was another child.

Sergeant Les Solaro went into the bedroom designated by the neighbor. He approached the crib, lifted the blanket inside, and discovered infant Sheila's body. A large gash was observed on the baby's throat and a large amount of blood covered the baby and the bedding in which her body rested. Dr. William Bogart, a pathologist, testified that Sheila's throat had been cut from one side to the next and that the wound resulted in the baby's death.

On October 12, while in the hospital, Linda made a composite sketch of her assailant with the help of a police technician. Officer George Newton saw the drawing and offered his opinion that it looked like either appellant or appellant's brother, Ira Guillebeau. Several days later, Linda observed both a photographic and a physical lineup, and at each lineup, positively identified appellant as the one who had sexually assaulted her. Linda also made an identification of appellant at the preliminary investigation.

A number of officers noted that they saw bloody shoeprints on the stairs leading from Linda's apartment. Those prints seemed to have been made by shoes with rippled soles. They also appeared to be similar to the prints left inside the apartment. Kathryn Holmes, a criminologist in the Contra Costa County Sheriff's Department, conducted comparison studies of the bloody shoeprints in Linda's apartment and concluded that the shoeprints had probably been made by the shoes appellant was wearing at the time of his arrest.

Holmes also testified to the presence of semen in a stain on Linda's couch. That stain was about 28 inches from a patch of blood on the other end of the couch. Holmes hypothesized that assuming the blood came from the throat area, the semen stain corresponded to where Linda's vagina would have been when she had been lying on the couch. Furthermore, the stain had Blood Group A substance in it. Both Linda and the appellant secrete Group A substances into their bodies (i.e., the Group A substances on the couch could have come from either Linda or appellant, or both).

The defense witness most helpful to appellant was his mother, Doris Guillebeau. Briefly, she offered the following alibi:

On October 7, 1976, appellant was living with Mrs. Guillebeau in her home in San Pablo. That evening, appellant and his brothers played cards for several hours. In fact, appellant and one brother, Neil, continued with their card games until 1:30 or 2 a.m. At that time, Mrs. Guillebeau told the two to go to bed. Appellant went to sleep after getting a bowl of ice cream. Neil went immediately to bed. Mrs. Guillebeau subsequently fell asleep between 2:30 and 3 a.m., but nevertheless knew for certain that appellant was still at home.

I

Appellant's first contention is that the trial court committed error by ruling that the jury would be informed of the dual plea of "not guilty" and "not guilty by reason of insanity" at the same time, prior to trial. Appellant insists that the entry of dual plea prior to trial prejudicially affects a criminal defendant's case because the jury would be more prone to convict the defendant in the guilty phase knowing that he has an opportunity to present an insanity defense and thus avoid any punishment. Appellant's contention is untenable for several reasons.

First, Penal Code[1] section 1026 explicitly contemplates that the dual pleas of "not guilty" and "not guilty by reason of insanity" are to be entered instantaneously and outlines the procedure to be followed in such a case. Thus, section 1026 provides in pertinent part that: *"When a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, he shall first be tried as if he had entered such other plea* or pleas *only,* and in such trial he shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed. *If the jury shall find the defendant guilty*, or if the defendant pleads only not guilty by reason of insanity, *then the question whether the defendant was sane or insane* at the time the offense was committed *shall be promptly tried, either before the same jury or before a new jury* in the discretion of the court." (Italics added.)

This section, which separates a criminal case involving the defense of insanity into two parts, has produced a system popularly labeled as "bifurcated trial." (Louisell & Hazard, *Insanity as a Defense: The Bifurcated Trial* (1961) 49 Cal.L.Rev. 805.) While the bifurcated trial system has been criticized on a variety of grounds (deprivation of due process; denial of right to jury trial; double jeopardy; waste of judicial

---

[1]All section references are to the Penal Code.

time) (*People v. McDowell* (1968) 69 Cal.2d 737 [73 Cal.Rptr. 1, 447 P.2d 97]; *People v. Wells* (1949) 33 Cal.2d 330 [202 P.2d 53] [both cases disapproved on other grounds in *People v. Wetmore* (1978) 22 Cal.3d 318, 327, fn. 7 [149 Cal.Rptr. 265, 583 P.2d 1308]; *People v. Leong Fook* (1928) 206 Cal. 64 [273 P. 779]; *People v. Hickman* (1928) 204 Cal. 470 [268 P. 909]), a recent California Supreme Court case has reaffirmed the continued validity of bifurcation by emphasizing that "the decision to modify or abolish the bifurcated trial remains, of course, a legislative prerogative." (*People v. Wetmore, supra*, 22 Cal.3d 318 at p. 331.)

■ Second, appellant's charge that he was prejudiced by the jury's advisement of the dual plea is lacking in sound legal support. It is well settled that if the defendant enters a double plea of "not guilty" and "not guilty by reason of insanity," the first phase of trial is held on the issue of guilt alone, and in this phase of the trial, the defendant is conclusively presumed sane. (*People v. Corona* (1978) 80 Cal.App.3d 684, 717 [145 Cal.Rptr. 894]; Witkin, Cal. Criminal Procedure, Trial, § 503, p. 509.) Since the mental capacity to commit the crime is conclusively presumed in the first phase, evidence tending to show the existence of legal insanity is barred at that stage. (*People v. Corona, supra.*)

■ As to the contention that once the jury learns of the double plea it cannot approach the question of guilt in an impartial way, it is sufficient to cite the following passage from *People v. Leong Fook, supra*, 206 Cal. 64 at page 78: "We must assume that a fair and impartial jury of intelligent men and women would obey...instructions and would therefore hold in reserve their ultimate finding upon the issue of the defendant's sanity until that separate issue and the evidence supporting it had, in the prescribed order of the trial, been committed to it for determination. We are not to assume that such a jury will cease to be fair and impartial as the cause progresses upon its successive issues, but, on the contrary, we must assume, in the absence of any other showing, that the jury has retained its attitude of fairness and impartiality under the changed procedure as before until the whole cause...has been determined."

Third, appellant's assertion that he was forced to withdraw the insanity plea because of the potential prejudice stemming from the entry of the double plea prior to trial, is likewise totally unfounded. To begin with, the record at bench fails to substantiate any type of coercion on

the part of the court and/or the prosecution. As a consequence, the withdrawal of the insanity plea cannot be regarded other than a tactical or strategic decision on the part of trial counsel which cannot be second-guessed on appeal. (*People* v. *Wein* (1958) 50 Cal.2d 383, 409 [326 P.2d 457] [overruled on other grounds in *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1140 (80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677)].) In addition, it is elementary that a criminal defendant is entitled to move the court to reinstate the insanity plea at any stage of the trial. As the cases explain, the insanity plea is not barred after the commencement of the trial where good cause is shown by the defendant (*In re Kubler* (1975) 53 Cal.App.3d 799, 806 [126 Cal.Rptr. 25]; *People* v. *Boyd* (1971) 16 Cal.App.3d 901, 908 [94 Cal.Rptr. 575]). It follows that appellant could have avoided the alleged prejudicial effect of the court ruling by taking appropriate measures to reinstate the insanity plea at the conclusion of the first stage of the trial. Under these circumstances his claim of prejudice cannot be heard on appeal.

## II

Appellant next argues that the trial court erroneously instructed the jury. First, he claims that the court erred in refusing to instruct the jury on the burden of proving identity per CALJIC No. 2.91.[2] Second, he maintains that the instruction on flight (CALJIC No. 2.52) also constituted prejudicial error. We proceed to address these issues separately.

### (a) The Trial Court's Refusal to Deliver CALJIC 2.91 Was Harmless Error

Section 1096a provides that when a statutory definition of reasonable doubt is given (§ 1096) no other instruction need be delivered defining reasonable doubt. ■ Despite this section, a defendant, upon proper request therefor, has a right to an instruction that directs attention to evidence from the consideration of which a reasonable doubt of guilt could be engendered. Or to put it another way, upon request, "A defendant is entitled to an instruction relating particular facts to any legal

---

[2]The instruction refused by the trial court read as follows: "The burden is on the State to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged. You must be satisfied beyond a reasonable doubt of the accuracy of the identification of defendant as the person who committed the offense before you may convict him. If, from the circumstances of the identification, you have a reasonable doubt whether defendant was the person who committed the offense, you must give the defendant the benefit of that doubt and find him not guilty."

issue." (*People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847]; *People* v. *Kane* (1946) 27 Cal.2d 693, 701 [166 P.2d 285].) Under this rule, defendant is entitled to an instruction relating identification to reasonable doubt. (*People* v. *Guzman* (1975) 47 Cal. App.3d 380, 387 [121 Cal.Rptr. 69]; *People* v. *Roberts* (1967) 256 Cal.App.2d 488, 492-494 [64 Cal.Rptr. 70].)

While the foregoing principles compel the conclusion that the refusal to instruct the jury per CALJIC No. 2.91 constituted error, we entertain no doubt that the error was harmless.

First of all, it is basic law that the instructions must be read as a whole. (*People* v. *Wingo* (1973) 34 Cal.App.3d 974 [110 Cal.Rptr. 448]; *People* v. *Rhodes* (1971) 21 Cal.App.3d 10, 21 [98 Cal.Rptr. 249].) (3c) In the present case the record shows that the jury was properly instructed on factors affecting the credibility of witnesses (CALJIC No. 2.20) which cover many of the matters which might affect the validity of a witness' identification testimony. Even more to the point, the court gave CALJIC No. 2.90, which defines the presumption of innocence and also CALJIC No. 4.50, which relates reasonable doubt to the alibi defense. Thus, the case comes squarely within *People* v. *Gomez* (1972) 24 Cal.App.3d 486 [100 Cal.Rptr. 896], where the court held that while the refusal to give CALJIC No. 2.91 was error it was deemed to be harmless in light of the fact that the jury was instructed per CALJIC Nos. 2.90 and 4.50. As the court stated at page 490: "[W]e conclude that the refusal of the requested instruction was not prejudicial. As we have shown above, the trial court did give the standard instruction on alibi, which contains language calling to the attention of the jury the necessity of finding beyond a reasonable doubt that defendant was present. We cannot say that a repetition of that injunction as an instruction directed to the identification testimony (which, in effect, went to the issue of alibi) would have added anything material to the jury's understanding of its duty."[3]

In the second place, the record is clear that Ms. Shepherd, the victim of the crimes, had ample opportunity and did in fact, observe her assail-

---

[3]Compare also *People* v. *Guzman, supra,* 47 Cal.App.3d 380, 388, where the court underscored that "if said error [the error of refusing CALJIC No. 2.91] stood alone we would hold it nonprejudicial in the light of the giving of general instructions on the credibility of witnesses (CALJIC No. 2.20)...and the last paragraph of CALJIC No. 4.50 on alibi, which expressly requires proof beyond a reasonable doubt as to the defendant's presence at the scene of·the crime (basically the same issue as is involved in identification)."

ant for an extended period of time and that she had no difficulty identifying appellant as the perpetrator of the crimes on numerous occasions (see discussion, *infra*). Under these circumstances, the potentiality of prejudice due to the lack of instruction on identification must be considered almost nil.

### ■ (b) The Delivery of CALJIC No. 2.52 Was Harmless Error

The trial court instructed the jury on the effect of flight on appellant's guilt or innocence. (CALJIC No. 2.52.)[4] Appellant complains that under facts here presented, the giving of the flight instruction was erroneous. The only issue raised by the defense was the identification of the defendant as the person who committed the offenses. The flight instruction was of no assistance to the jury on this issue and thus should not have been given. (*People* v. *Anjell* (1979) 100 Cal.App.3d 189, 199-200 [160 Cal.Rptr. 669].) The error nevertheless is not prejudicial. The instruction told the jury that the fact of flight "if proved," might be considered with all other circumstances in determining guilt, and that the weight of such circumstance was for them to determine. (See *People* v. *Anjell, supra*, at p. 201.)

### III

■ Appellant contends that the court erred in refusing his motion for a mistrial.

Appellant's mother appeared as a witness on behalf of the defense. On direct examination, she testified that appellant was home at the time of the charged crimes. Apparently to undercut a possible claim of recent fabrication, she also stated that she remembered this because, after reading in the newspaper about appellant's arrest, she tried to recall where he had been at the described time.

On cross-examination, appellant's mother asserted that she read about appellant's situation on October 16, 1976. To impeach her the district attorney asked:

---

[4]The challenged instruction read as follows: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

"Q. Isn't it true that Mr. Sjostrand [an investigator with the district attorney's office] went over to your house on the 15th of October and that he told you that [appellant] had been charged?

"A. Sjostrand. I recall him telling me that [appellant] had confessed to this crime.—That's what he told me." Later, after Mrs. Guillebeau made a few other references to the confession, the district attorney sought the following clarification:

"Q. Didn't [Mr. Sjostrand] tell you [on October 15] that your son was charged with 187/murder?

"A. He told me that [appellant] was pressured into making a statement that he did this crime—That's what he told me.

"Q. So, you were aware of this crime then on the 15th, isn't that right?

"A. When I got aware of the crime was when I read it in the paper. But I was aware, was told by Mr. Sjostrand—whatever his name is—that he had confessed to this crime. But I read it in the newspaper. That's how I was aware that he was charged with this crime."

The day after this testimony, appellant moved for a mistrial. The court replied: "...I certainly know of no way that when a defense witness brings the matter up that it would be grounds for a mistrial.

"[The district attorney] had no control over [Doris Guillebeau] whatsoever. If he had any control, however, or had any witnesses that he were to produce that would—let's say, even inadvertently, let this come in, that could very well be obviously grounds for a mistrial. But under the facts as we have them here, I see no...factual basis whatsoever for a mistrial. Accordingly, the motion will be denied."

Appellant now argues that the trial court erred in making this ruling. Appellant's position is not well taken.

The legal principles relating to a motion for a mistrial are well settled. ■ To start with, a motion for a mistrial presupposes that the effect of the objectionable evidence "is so prejudicial as to be incurable by striking it and admonishing the jury to disregard it. In other

words, a motion to strike presupposes error of some sort, whereas the motion for mistrial presupposes error plus incurable prejudice." (*People v. Woodberry* (1970) 10 Cal.App.3d 695, 708 [89 Cal.Rptr. 330].) Moreover, it is widely recognized that a motion for a mistrial is addressed to the sound discretion of the trial court and it may be properly refused where the court is satisfied that no injustice has resulted from the occurrences of which the party complains. (*People v. Romero* (1977) 68 Cal.App.3d 543, 548 [137 Cal.Rptr. 675]; *People v. Slocum* (1975) 52 Cal.App.3d 867, 884 [125 Cal.Rptr. 442]; *People v. Ray* (1967) 252 Cal.App.2d 932, 962 [61 Cal.Rptr. 1].) Finally, it has been said that where the motion is made at the early stages of the trial, it is more likely to be granted since the judge, having heard little of the evidence, cannot evaluate its prejudicial effect on the case as a whole. (*People v. Woodberry, supra*, 10 Cal.App.3d at p. 709.)

■ Although not explicitly stated, appellant, in effect, claims that mistrial should have been granted because (a) the prosecutor committed misconduct in eliciting testimony from the witness in an improper way and (b) the evidence admitted during appellant's mother's cross-examination resulted in incurable prejudice to appellant's cause.

■ As far as the charge of prosecutorial misconduct is concerned, it is established that the misconduct of the prosecutor implies a dishonest act or attempt to persuade the jury or the court by use of deceptive or reprehensible methods. (*People v. Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913].)

■ In the present case the mother testified that she first learned that her son had been charged with the crime by reading about it in a newspaper on October 16. The mother was appellant's alibi witness, thus her ability to remember dates and details was important. The prosecutor's question that she had actually learned of her son's situation from Mr. Sjostrand on October 15 was a proper question and in no way called for the answer that the witness volunteered concerning the confession. It cannot be said that the prosecutor deliberately structured the question to obtain that answer or that he "set the witness up." The subsequent questioning was error, but whatever prejudice might have resulted from mentioning the confession, had already been sustained by the witness' volunteered answer.

## IV

■ Appellant's next contention is that the trial court erred in excluding relevant evidence tending to show that Ms. Shepherd, not appellant, had murdered the child. Specifically, appellant proffered the testimony of two witnesses who observed Linda Shepherd make four phone calls to Hot Line, an assistance organization, indicating that she wanted to harm the baby who was murdered. In addition, appellant made an offer of proof that Mrs. Blumberg, the person operating the phones at Hot Line, believed that the calls were not pranks and that the caller was capable of seriously injuring the child.

■ As an established principle, a defendant may show that another person committed the crime and that he himself is innocent. (*People v. Smith* (1970) 13 Cal.App.3d 897, 902 [91 Cal.Rptr. 786, 52 A.L.R.3d 875]; *People v. Mitchell* (1893) 100 Cal. 328, 333-334 [34 P. 698].) However, this does not mean that unlimited inquiry may be made into collateral matters. Thus, the cases emphasize that the mere *possibility* that some other person committed the crime is not enough to show the defendant's innocence. To the contrary, there must be some competent and substantial evidence of a *probability* that the other person is guilty of the offense. (*People v. Edmond* (1962) 200 Cal.App.2d 278, 281 [19 Cal.Rptr. 302]; *People v. Buono* (1961) 191 Cal.App.2d 203, 228 [12 Cal.Rptr. 604].)

In determining if such evidence should be admitted, the court must consider whether the probative value of the proffered evidence is outweighed by the probability that its admission would "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) In line with these principles it has been said that "[i]n a criminal case, evidence which simply affords a possible ground of suspicion against a third person is generally excluded as unduly prejudicial." (*People v. Whitney* (1978) 76 Cal.App.3d 863, 869-870 [143 Cal.Rptr. 301].) The rationale for this rule is that "the prosecution as well as the defendant is entitled to the protection of the court from prejudicial evidence." (*People v. Arline* (1970) 13 Cal.App.3d 200, 205 [91 Cal.Rptr. 520].)

■ When viewed in light of the aforestated premises, the proffered evidence here failed to sufficiently connect Ms. Shepherd with the commission of the crime. While it indicated that Linda made telephone calls about having harmed one of her children, the proffered evidence

did not reveal that she ever harmed her child, nor did it disclose even a design that she in reality intended to abuse the child in the future. The evidence proffered at the special hearing thus disclosed no more than that the calls by Ms. Shepherd were intended merely as irresponsible pranks and that the calls in question afforded at best a possible ground for suspicion and nothing more. In these circumstances the finding of the trial court that appellant failed to offer "competent substantial proof of the probability that in fact Linda Shepherd did kill her daughter," is abundantly supported by the record. Consequently, the ruling excluding the proffered evidence must be held eminently correct. (Evid. Code, § 352; *People v. Arline, supra*, 13 Cal.App.3d 200.)

## V

Appellant next contends that the trial court erred in admitting testimony about an experiment conducted by a criminalist. The experiment in question involved a pair of shoes worn by appellant at the time of his arrest and the bloody shoe prints left at the scene. The criminalist believed that the pair of shoes appellant was wearing at the time of his arrest probably made the bloody shoe prints because their patterns were similar to each other in size, shape, and general configuration. However, the shoes appellant was wearing had a few slightly different marks along certain parts of the ridges on the soles. The criminalist wanted to know whether as a physical characteristic the soles of appellant's shoes could be worn down to a particular level, which would explain the slight difference in the ridge.

To this end, the criminalist obtained shoes of the same model and within a half size of the ones appellant was wearing and gave them to a police officer to wear. The criminalist told the officer to wear the shoes and return when the ridge pattern on the soles was worn down to a certain level. The criminalist made ink patterns of the shoes. She then had the officer return at four-day intervals (the same time interval that occurred between appellant's arrest and the day of the murder), and each time made patterns of the soles.

Frequently, a controlled experiment may be conducted in an effort to have a particular circumstance of a case replicated. An expert may then testify about the results. Based on those results, the expert may further offer an opinion regarding how the actual circumstance of the case occurred. In such a situation, "[t]he relevancy of experimental evidence ordinarily depends upon a showing that the conditions of the

experiment were substantially similar to those which gave rise to the issue on which the evidence is offered." (Witkin, Cal. Evidence (2d ed. 1966) § 651, p. 612.)

By contrast, in this case the criminalist did not conduct the experiment in issue to determine how appellant wore down the ridge pattern on the soles of his shoes over a four-day period. She did not conduct the experiment in order to be able to testify that after the given period appellant must have worn down the pattern to a particular level. Rather, she simply wanted to determine a particular characteristic about the ridge pattern. She merely wanted to ascertain whether, as a physical possibility, the pattern could be worn away in a four-day period. Under this circumstance, where a physical characteristic and not a sequence of events was in question, replication of the manner in which appellant wore his shoes was not needed. Instead, replication of the shoes themselves was all that was necessary. The criminalist complied with this latter requirement.

*People v. Carter* (1957) 48 Cal.2d 737 [312 P.2d 665], supports this position. In that case, the prosecution charged that defendant committed murder by beating the victim to death. At trial, a prosecution expert in addition to commenting about his general knowledge of chemistry, physics, and "blood dynamics" also testified that he had conducted experiments in beating bloody objects with various instruments to determine the relationship between blood spots and their causes. He then testified about blood spots at the murder scene and on defendant's clothes, and gave his opinion on the conditions of the murder.

On appeal, defendant contended that the evidence about the experiments should not have been admitted because the experiments were not conducted under circumstances substantially similar to those at the scene of the crime. The Supreme Court observed that "[t]he prosecution made no attempt to show that because certain spots were produced by a certain cause in the experiments, similar spots on defendant's clothes or the floor of the...[crime scene] must have been produced by a similar cause." The court then went on to say: "Evidence that he had made the experiments was introduced to qualify him as an expert in blood dynamics, to show that by training and experience he was able from an analysis of the size and shape of blood spots to determine their source with some degree of accuracy, and to enable the jury to test the reliability of his opinions by revealing their foundation. For these pur-

poses the evidence was properly admitted." (*People v. Carter, supra,* 48 Cal.2d at p. 750.)

Like the expert in *Carter*, the criminalist in this case made no effort to show that, because the ridge pattern on the shoes for her experiment was worn down in a certain way, the pattern on appellant's shoes must have been worn down in a similar way. To the contrary, she sought only to learn about a physical characteristic of the pattern. For this reason, *she was required to have substantial similarity in the shoe and not similarity in the wearing conditions.*

) It is, of course, well settled that the reception or rejection of experiment testimony lies largely with the discretion of the trial court whose ruling will not be disturbed in the absence of abuse. (*People v. Ely* (1928) 203 Cal. 628, 633 [265 P. 818]; *People v. Swain* (1962) 200 Cal.App.2d 344, 349 [19 Cal.Rptr. 403].) Appellant here has failed to show an abuse of discretion.

## VI

Appellant objects to the trial court's ruling denying his motion to suppress evidence on two basic grounds. First, he argues that the police officers seized evidence beyond the scope of the search warrant. Second, he asserts that the search and seizure should be invalidated because the officers filed an improper return to the warrant. Appellant's contentions are discussed seriatim.

) (a) The Officers Lawfully Seized the Evidence in Question

As far as the first question is concerned, appellant claims that the search warrant, which was issued for appellant's residence in San Pablo, authorized the seizure of a paring knife, a pair of jeans with braid on the pocket, any bloody male undergarments or a man's shirt with blood stains, towels or rags with blood on them, and indicia of residence, including bills and receipts in the name of appellant.

Nevertheless, the officers conducting the search seized three pairs of shoes with waffled-like pattern soles and an edition of the *Richmond Independent* containing an article about the murder, items that were not listed in the search warrant. These items were found in the same room where the items seized under the warrant were found.

 The general rule concerning the permissible scope of a search conducted pursuant to a warrant is that "only the property described in the warrant may be seized." (*Skelton v. Superior Court* (1969) 1 Cal. 3d 144, 155 [81 Cal.Rptr. 613, 460 P.2d 485].) However, there is a well-established exception under which the challenged seizures can be held to be lawful. As the court stated in *Skelton* at page 157: "When officers, in the course of a bona fide effort to execute a valid search warrant, discover articles which, although not included in the warrant, are reasonably identifiable as contraband, they may seize them whether they are initially in plain sight or come into plain sight subsequently, as a result of the officers' efforts."

In *People v. Hill* (1974) 12 Cal.3d 731, 762 [117 Cal.Rptr. 393, 528 P.2d 1], the Supreme Court, quoting from *Warden v. Hayden* (1967) 387 U.S. 294, 307 [18 L.Ed.2d 782, 792, 87 S.Ct. 1642], elaborated on this principle: "'There must...be a *nexus*—automatically provided in the case of *fruits*, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus in the case of "mere evidence," probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction.'" (Italics added.) The Supreme Court further stated that: "[t]he 'nexus rule' of *Warden*, which involved a lawful warrantless search, applies with equal force and effect in the context of a search conducted pursuant to a warrant." (*Id.*, at p. 762.)

In applying the above-stated principle, the Supreme Court in *Hill*, rejected the People's argument that the seizure of four tape recordings not listed in the search warrant which were seized by officers on the ground that they might reveal something was valid, by stating: "Mere speculation such as this is insufficient. The police officers who seize an article must be presently aware of some specific and articulable fact from which a rational link between the item seized and criminal behavior can be inferred." (*Id.*, at p. 763.)

 In the present case, appellant argues that officers seized the shoes and newspaper on the mere speculation that they might relate to the crime and that there was no rational nexus between the items seized and the crime. We reject appellant's argument for the following reasons.

To begin with, the officer in charge of the search, Detective Tye, was aware that waffled-like shoe prints were left at the scene of the crime

and that appellant was wearing shoes with a similar pattern at the time of his arrest; consequently, since the three pairs of shoes that were seized at appellant's residence also had this waffled-like pattern, it is reasonable to assume, as Detective Tye did, that they might be linked with the crime.

Moreover, with respect to the newspaper containing an article about the murder, which was wedged between the mattress and drawer of the chest of drawers, Detective Tye knew (by virtue of his experience as a homicide detective, and in particular, because he recalled two homicide investigations where the suspects possessed newspaper articles about their offenses), that suspects commonly harbor newspaper accounts of their offenses. It is for this reason Detective Tye seized the newspaper. Significantly, it was the only newspaper in the area of search and therefore was not selectively retrieved by Detective Tye. All this leads to the inevitable conclusion that in the case at bench, there was a sufficient nexus between the items seized and appellant's criminal behavior and as a consequence, the seizure of said items must be held lawful.

### ■ (b) The Officer's Failure to File a Full Return of All Property Seized Does Not Invalidate the Warrant

Appellant's second contention is that officers conducting the search of appellant's residence filed an improper return to the warrant, in that they completed the return listing only as to the evidence seized pursuant to the warrant and did not list on the return evidence seized outside the warrant. The evidence seized outside the warrant included the three pair of shoes and the newspaper containing the article about the murder.

Relying on section 1537[5] and *People* v. *Mills* (1967) 251 Cal.App.2d 420, 422 [59 Cal.Rptr. 489], appellant maintains that the requirements of search warrant statutes are mandatory in every material respect and that the failure to comply with the statutory requirements in a strict fashion invalidates the entire warrant. We disagree.

---

[5]Section 1537 provides: "*The officer must forthwith return the warrant to the magistrate, and deliver to him a written inventory of the property taken,* made publicly or in the presence of the person from whose possession it was taken and of the applicant for the warrant, if they are present, verified by the affidavit of the officer at the foot of the inventory, and taken before the magistrate at the time, to the following effect: 'I, R.S., the officer by whom this warrant was executed, do swear that the above inventory contains a true and detailed account of all the property taken by me on the warrant.'" (Italics added.)

Although the precise issue here raised has not been addressed nor decided by any California decision we know of, secondary authority suggests that the procedure outlined in section 1537 or similar statutory enactments is ministerial in nature and does not invalidate the search warrant. As stated in 79 Corpus Juris Secundum, Searches and Seizures, section 84, pages 906-907: "While it is the duty of the officers executing a search warrant to make a return thereof in the manner provided by law, as a general rule *the failure of an officer to make a return of a search warrant properly issued and served will not invalidate the search warrant*, or a search and seizure made thereunder, even where the statute requires the return within a certain time, *the return being merely a ministerial act*, which may be performed later, at least within a reasonable time. . . .

"

"*The omission to make a full return is an irregularity that may be corrected on motion. Likewise, a search warrant does not become void because of an improper return*, or error therein, or, in the absence of prejudice resulting therefrom, because of statements therein, since it may be amended to conform to the facts." (Italics added.)

The above-stated proposition is supported by, *People* v. *Phillips* (1958) 163 Cal.App.2d 541 [329 P.2d 621] [disapproved on other grounds in *People* v. *Butler* (1966) 64 Cal.2d 842, 845 [52 Cal.Rptr. 4, 415 P.2d 819]. In *Phillips*, the defendant sought to suppress certain evidence seized pursuant to a warrant on the ground that the inventory was not taken in her presence and no copy of it was given to her. The appellate court concluded that "the required act by the officer was a ministerial one and created a defect, *but did not void the effectiveness of the warrant* or contaminate the evidentiary value of the property seized under the warrant." (*People* v. *Phillips, supra*, at p. 548, italics added.) Since the listing in the return of all of the property seized in the case at bench constitutes a ministerial act, the officer's good faith failure to provide a complete list of the property seized does not invalidate the warrant.

## VII

Appellant argues that the pretrial identification conducted by the police officers was impermissibly suggestive and tainted the in-court identification of appellant. Appellant's argument is meritless.

██ As the United States Supreme Court has stated: "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967].) Whether the pretrial identification was unduly suggestive turns on the facts of each case and the ruling of the trial court will be sustained if supported by substantial evidence. (*People v. Hawkins* (1970) 7 Cal.App.3d 117, 122 [86 Cal.Rptr. 428].)

██ When viewed under these standards, the instant facts dispel appellant's contention that his due process rights were violated for impermissibly suggestive pretrial identification procedures. The summarized facts reveal that on October 12, 1976, Linda Shepherd, with the help of a police specialist, made a composite drawing of her assailant. After the drawing was completed, police officers recognized the man as either appellant or the appellant's brother. On October 14, 1976, Ms. Shepherd was shown by police officers six Polaroid, color photographs of various individuals, including appellant. She identified appellant as her assailant.

On October 15, police showed to Ms. Shepherd another photographic lineup consisting of three black and white pictures, two of the pictures were of appellant, one taken on January 24, 1973, and the other was taken on May 6, 1973. The third picture was of appellant's brother. Ms. Shepherd identified the May 6 picture of appellant as the person who assaulted her.

After identifying the appellant for a second time, Ms. Shepherd indicated to police that she wanted to see the person whose picture she picked out personally. Approximately three hours after the second photographic lineup a physical lineup was produced and once again, Ms. Shepherd identified appellant as her assailant.

Despite the circumstance that Ms. Shepherd identified appellant three times in the pretrial identification procedures and also in the court, appellant insists that the identification was unduly suggestive because (1) in the first photographic lineup appellant, a Negro, was darker skinned than the other five persons (also Negroes) whose pictures were shown to Ms. Shepherd and (2) in the second black and

white photographic lineup, two of the three pictures were those of appellant. Appellant's argument is entirely groundless.

First of all, due to the relatively long duration of the commission of the crimes and appellant's extended presence in the apartment, Ms. Shepherd had plenty of opportunity to observe appellant which reduced the possibility of an eventual misidentification to almost nil. Indeed, the record betrays that Ms. Shepherd was able to help make a composite picture of her assailant which strongly resembled appellant. In addition, she could identify appellant in court on the basis of independent recollection and emphasized that she would never forget appellant's face.

Although the foregoing evidence is per se sufficient to sustain appellant's in-court identification, we observe that neither the six-picture, nor the second photographic lineup may be held improper. While in the six-picture color photo lineup appellant was darker complected than the other Negroes, this does not by itself render the identification unduly suggestive especially in light of the fact that during that procedure the officer advised Ms. Shepherd that her assailant might not be among the pictures at all. As far as the second photo lineup is concerned, it bears emphasis that appellant's brother whose picture was placed among the three photos shown to Ms. Shepherd closely resembled appellant. If anything, the procedure followed in the second photo lineup was prone to confuse rather than help Ms. Shepherd in her effort to identify her attacker.

We briefly note that *People* v. *Martin* (1970) 2 Cal.3d 822 [87 Cal.Rptr. 709, 471 P.2d 29], and *People* v. *Bisogni* (1971) 4 Cal.3d 582 [94 Cal.Rptr. 164, 483 P.2d 780], fail to support appellant's position. *Bisogni* involved a single person showup which by its very nature is deemed highly prejudicial. In *Martin*, in turn, the court found impermissible suggestiveness because the suspect was displayed to the witness in the company of a uniformed officer.

## VIII

Appellant lastly contends that the imposition of consecutive sentences violated the provisions of section 669. Respondent concedes that appellant's position is meritorious. Accordingly, the consecutive sentences imposed upon appellant must be stricken and all terms must merge with the life sentence.

The judgment is modified by striking therefrom any reference to consecutive sentences. As so modified the judgment is affirmed.

Rattigan, J., and Christian, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 21, 1980, Bird, C. J., was of the opinion that the petition should be granted.