Filed 4/18/13  P. v. Hardy CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DARRIS DONNELL HARDY,<br><br>    Defendant and Appellant. | B234990<br><br>(Los Angeles County<br>Super. Ct. No. BA358469) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Alex Ricciardulli, Judge.  Affirmed.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Carl N. Henry, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury found Darris Donnell Hardy guilty of attempted premeditated murder, torture, and aggravated mayhem, and found true that the victim suffered great bodily injury. The trial court found that Hardy was legally sane, and sentenced Hardy to 38 years to life on the attempted murder conviction, staying the sentences on the other counts. Hardy appeals, arguing that the trial court erred in reopening the evidence during jury deliberations, in failing to instruct on lesser included offenses, and in concluding that there was sufficient evidence that Hardy was legally sane. We find no error, and we affirm.

## BACKGROUND

An information filed August 12, 2009 charged Hardy with attempted premeditated murder in violation of Penal Code[1] sections 187, subdivision (a), and 664; torture in violation of section 206; and aggravated mayhem in violation of section 205, all in regard to Alafia Robinson. As to all three counts, the information alleged that Hardy inflicted great bodily injury on Robinson. The information also alleged that Hardy had three serious or violent felony convictions under sections 667, subdivisions (b)-(i), and 1170.12, subdivisions (a)-(d) (the "Three Strikes" law), and three prior serious felony convictions under section 667, subdivision (a)(1).

Hardy pleaded not guilty and denied the special allegations. He later withdrew his plea and pleaded not guilty and not guilty by reason of insanity. The trial court appointed experts to examine Hardy for legal insanity. Hardy waived a jury trial on the issue of his sanity, and his motion to bifurcate the enhancement allegations was granted.

After trial, the jury found Hardy guilty on all counts and found true the great bodily injury allegation. After hearing the evidence in a bifurcated proceeding, Hardy admitted the truth of the enhancement allegations. Following a court trial, the court found Hardy legally sane as to all the charges.

The court sentenced Hardy to 38 years to life with a possibility of parole for attempted murder, consisting of 25 years to life under the Three Strikes law, two five-

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

year enhancements under section 667, subdivision (a)(2), and three years for the great bodily injury enhancement. The court stayed sentencing for torture and aggravated mayhem under section 654. Hardy was awarded presentence custody credit and ordered to pay fines. He filed this timely appeal.

**Testimony at trial**

A firefighter and paramedic for the Los Angeles Fire Department testified that around 2:42 a.m. on April 11, 2009, he responded to an alarm call at Wall and Vernon, where he saw a flaming pile of clothing in the middle of the street, with Robinson distraught and screaming nearby. Robinson's body had been burned from his mid abdomen to his face, with his skin red and blistering. Some of his skin had begun to come off. The paramedics put Robinson on a gurney and put him into the ambulance, pouring water on him to stop the burning and cool the skin. Robinson continued to scream in pain. At the hospital, Robinson was immediately sedated and intubated to keep his airway open. A police officer who responded to the scene found some clothes still smoldering in the street, and Robinson's jeans were on the sidewalk with his wallet in the pocket, smelling of gasoline.

A neighbor testified that she was awake and watching television at around 2:30 a.m. on April 11, 2009 and heard someone arguing outside. That "seemed like an everyday occurrence," as people were always arguing and yelling out there. She looked out only when she saw light and flames through the window. A tall, heavy dark-skinned man was "completely burned," saying, "Oh God, oh God," and trying to put the flames out on the grass; his skin was melting. She called the police. She did not see anyone set the man on fire, "just heard him and someone else arguing," and although she did not know much English, she heard very loud yelling and "some cuss words." On cross-examination, she explained she couldn't say how many there were, but she heard men arguing very loudly.

Robinson testified that on April 11, 2009, he was visiting his father. Early that morning, at 12:30 a.m. or 1:00 a.m., he had gone to a liquor store across the street. Hardy, who Robinson had seen before, was standing in front of the store asking those

3

entering for money.  Hardy asked Robinson for money, and Robinson said, "Not today bro."  Hardy kept panhandling, acting strange and talking to himself, "kind of a little psychotic," and seemed angry.  Robinson bought a 12 pack and took it back to his father's house to have a few beers.

Robinson returned to the liquor store and was hanging out in the parking lot with some friends, including an acquaintance nicknamed Blue, who was working as a security guard for the parking lot.  Blue chased Hardy into the street.  Hardy then returned to the parking lot for 15-20 minutes before leaving.  Robinson, who used to live in the area, had seen Hardy pushing a shopping basket, and assumed he was homeless.  Robinson had never had a confrontation with Hardy, that night or at any other time.

Robinson went back across the street and sat on the porch drinking beer.  He left at 1:30 a.m. or 2:00 a.m. to go to a girlfriend's house, and was walking down the street alone when Hardy walked toward him.  Robinson could hear people in the neighborhood talking, and then he heard Hardy say, "'I'm going to squash this'" once or twice.  Hardy had his hand behind his back, and when he got close to Robinson he pulled out a plastic milk gallon and threw it at Robinson, and then turned and ran.  The gallon contained something like kerosene and was already lit.

Robinson heard a boom and was engulfed in flames.  The liquid hit his arms, splashed his face, and ignited his clothes.  When he breathed, he inhaled fire, and although he tried taking his clothes off, the liquid was sinking into his skin and burning.  He ran to one house but found no water, and ran to another.  A few people in the area called 911.  Robinson looked down and saw that his skin was falling off his arms.

By the time the ambulance arrived, Robinson was hysterical.  At the hospital, he was unable to breathe and went into a coma.  He was burned all over his face, torso, back, and stomach.  He remained in a coma for six to eight weeks, and then was on a breathing machine. Robinson was in the hospital for three months, a rehabilitation center to learn to walk again, and then continued with outpatient therapy.  He was still in pain at the time of trial, had undergone a number of surgeries, and might need more.  He had trouble breathing, his legs were weak, he no longer drove, and he was legally disabled.

4

Two and a half months later, Robinson was near Los Angeles County U.S.C. Medical Center after leaving a doctor's appointment, with his mother driving. As his mother came back to the parked SUV with some chicken from a Popeye's, Robinson (who was in the passenger seat) saw Hardy "in the same state of mind and not paying attention to what was going on." Robinson told his mother "that's the guy right there." She drove up by the store as Hardy walked in, and pulled over while waiting for him to exit. Hardy came out, and put his hand out to beg for money. He did not recognize Robinson through the tinted windows of the SUV. Hardy walked off and continued to panhandle. Robinson called the police. His mother ran across the street to an officer on a Segway, and told him, "'We need to apprehend this guy.'" As Robinson's mother came back to the SUV, Hardy walked away.

The police caught Hardy on a bridge some distance away, and then drove Robinson (who was using a walker) in a police car to the bridge, where he identified Hardy. Robinson was "120 percent" certain that Hardy was the person who set him on fire. Robinson remembered from the night of the incident that Hardy "has a gap in his mouth, a big gap," and he noticed the gap in Hardy's teeth again on the day Hardy was arrested.

Robinson admitted he had a 2008 felony conviction for selling cocaine. On cross-examination, Robinson stated that on the night of the attack he had four or five beers at his father's house, and could have smoked "a couple joints." Blue and another security guard, not Robinson, had chased Hardy away from the store. Robinson did not recall telling the police that Hardy had jumped out of the bushes at him as he walked down the street (although there were bushes on the opposite sides of both streets), or that he participated in chasing Hardy away from the liquor store. Robinson denied arguing with anyone just before he was attacked.

Los Angeles Police Department Lieutenant Michael Oppelt was the investigating officer. On the morning of the attack, he attempted to interview Robinson, but was denied access by medical personnel at the burn unit because Robinson was intubated and unable to speak. Six weeks later, on May 26, he interviewed Robinson.

Robinson told Lieutenant Oppelt that an employee of the liquor store had told Robinson and Blue to run off a transient who was outside harassing customers. They ran the person off, and he came back. Robinson said the assailant came out of nowhere, and told him, "they were going to settle it." Robinson said the assailant came out of the bushes as if "he was characterizing just the suddenness of it." In his report, Lieutenant Oppelt used quotation marks around the phrase "jump out of the bushes." Robinson said he did not know his assailant by name or otherwise. The police were never able to locate Blue. Robinson described the suspect as "a black male . . . 37 to 40 years old, 6 feet tall, 190 pounds, with a gap in his teeth, always wears a black baseball cap and prescription glasses."

The defense did not present evidence.

**Jury request to view Hardy's teeth**

During deliberations, the jury requested a readback of Lieutenant Oppelt's testimony "especially the part regarding the description mentioning bushes," and the court complied. The jury then asked to see Hardy "smile and stand up. They want to confirm the gap in the defendant's front teeth." The defense objected: "that is additional evidence that should have been presented to the jury before the people closed and before argument. So essentially what they are asking is for additional evidence to be presented to them." The court agreed that it was new evidence, but "since it seems not to be something that is subject to dispute, I'm going to allow it." The court permitted both counsel to reopen to present additional argument "based on the new evidence, which is going to consist of the jury inspecting the defendant's teeth." The court also offered, in the alternative, that counsel could stipulate that Hardy had a gap in his teeth, but counsel declined.

Hardy smiled for the court and counsel, and the court commented: "Now, from the court's perception, it appears that there is a large gap in the defendant's upper front teeth." Counsel argued that the gap was from a missing tooth, and "the argument under [Evidence Code Section] 352 is we don't know when he lost that tooth. And now having him display, over two years later, a missing tooth is prejudicial to him, because that

6

evidence was not presented at the time of trial so that it could be refuted or contradicted that this missing tooth occurred either while he was in jail or prior to him being arrested." The court responded that there was no Fifth Amendment privilege regarding a defendant's physical appearance, and allowed the evidence with argument by both sides. "All I want to know is, once we bring in the jury and the alternates, that we are not going to have a problem with the defendant opening his mouth, because then that would be, in effect, another new type of evidence which would be a type of consciousness of guilt and both sides could argue it."

After conferring with counsel, Hardy refused to cooperate or to be present before the jury. The court stated that it would instruct the jury on withholding evidence, and defense counsel objected to the instruction because the defense had not had the opportunity to cross-examine Robinson about the location or size of the gap. The court denied the objection.

In the presence of the jury, the court explained that it had ordered Hardy to stand up and open his mouth and he refused to do so or to be present. The court gave the additional instruction: "If the defendant tried to hide evidence, that conduct may show that he is aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself." The prosecutor argued that Robinson testified that the defendant had a gap in his teeth, Lieutenant Oppelt testified that Robinson described the gap, and the defense had had the opportunity to cross-examine them both. Hardy's refusal was evidence of his guilt. Hardy's counsel argued that Hardy cooperated when he was detained and thereafter, and if the jury had a reasonable doubt whether he had a gap in his teeth, the jury had a duty to acquit. The prosecution had the opportunity during trial to ask Hardy to show his teeth, and Hardy's refusal to cooperate now was not necessarily evidence of guilt.

The jury resumed deliberations. After asking for and receiving a readback of Robinson's testimony, the jury rendered a guilty verdict on all three counts and found the allegation of great bodily injury to be true.

7

**The sanity phase**

Following Hardy's admission of the truth of the enhancement allegations, a court trial on his sanity began. The parties stipulated to the admission of a report by Dr. Mark E. Jaffe, the defense psychiatrist. Dr. Jaffe's report concluded that while Hardy suffered from "Bipolar disorder, Polysubstance Dependence and Antisocial Personality disorder," he was not legally insane at the time of the crime. Hardy drank liquor daily and used cocaine. Hardy also had a long history of psychiatric hospitalizations and had attacked police and patients during his hospital stays. About two weeks before the crime, he had been admitted on an involuntary hold and "was thinking of overdosing on medication or burning an unspecified person." Hardy believed Robinson had called him a snitch and acted with the desire for revenge; "[e]ven if this were a delusion, it would not provide justification for committing the controlling offense." Further, Hardy ran away after the crime and then denied any involvement, which showed that he understood the wrongfulness of his action.

The defense called as a witness Dr. Barry T. Hirsch, the prosecutor's expert, and moved Dr. Hirsch's report into evidence.[2] Dr. Hirsch testified that he had concluded that Hardy acted out of vengeance. The standard for showing that a defendant was not guilty by reason of insanity was that he did not know and understand the nature and quality of his actions, due to a mental disorder. Hardy had been diagnosed with a variety of different mental disorders, including paranoia and schizophrenia. Medication would

---

[2] The report concluded that Hardy "has a long history of functioning in a psychotic manner," and suffered from paranoid schizophrenia with auditory hallucinations (including of a command type), which were exacerbated by abuse of alcohol and cocaine. Nevertheless, "this disorder did not prevent him from having a state of mind that allowed him to plan, in a goal directed manner, to allegedly engage in actions [fns. omitted]" that threatened Robinson's life and could cause Robinson great bodily injury. Dr. Hirsch believed that Hardy "engaged in revenge motivated, retaliatory behaviors that were not based upon present self-defense needs," knowing that his behavior was morally wrong. Hardy knew and understood the nature and quality of his acts, and was able to distinguish whether they were right or wrong, at the time of the commission of the attack on Robinson.

reduce his symptoms. Hardy had been discharged from a psychiatric hospital on April 6, 2009, five days before his encounter with Robinson. Hardy had flammable materials which he lit to set Robinson on fire, which required the ability to plan, and "planned, goal-directed behavior . . . is not a hallmark of someone who is insane." While Hardy had stated he heard voices that commanded him to do certain things, he had also had an altercation of some kind with Robinson, and after his discharge he proceeded with "a line of behavior that is planned and goal-directed that is not in accord with the way psychotic people generally function." "[H]e made a plan to approach the man and dump an accelerant on him, which he did." Dr. Hirsch's conclusion remained that Hardy was legally sane at the time of the commission of the attack on Robinson.

Hardy testified in his own behalf. After his release from prison in early 2009, he suffered from depression and paranoia because he had not been properly medicated while incarcerated. He had no medication in his system when he was admitted to the psychiatric hospital in March 2009, where he stayed for eight days. He was struggling at the time and stated: "I don't know where I was at and what I was really doing." When he attacked Robinson with flammable liquid, he was "delusionary" and psychotic, and could not say what led him to do it. Hardy stated: "I was not in my . . . right mind" and further added: "I don't know what was the purpose of it." He was pushing his shopping basket, and he had "these type of things in [his] basket." He did not remember walking down the street with a firebomb in his hand, but he did know how to make one from watching "cowboy movies." He probably had a confrontation with Robinson.

In closing, Hardy's counsel discounted Dr. Jaffe's report and disputed the conclusion of Dr. Hirsch's report. The prosecution argued that both experts had reached the conclusion that Hardy was legally sane at the time of the crime.

The court concluded that the defense had failed to prove that Hardy was insane at the time of the offense. Although Hardy had a mental disease or defect (paranoid schizophrenia and antisocial personality disorder), the evidence showed that Hardy felt picked on by Robinson and "he set the victim on fire in revenge or in retaliation to 'squash this.'" Hardy "was capable of knowing or understanding the nature and quality

9

of the act in question and . . . was capable of knowing and understanding that the act was morally and legally wrong."

**DISCUSSION**

**I.  Hardy's due process rights were not violated by reopening evidence.**

Hardy argues that his due process rights were violated when the trial court reopened the evidence in response to the jury's request to see Hardy smile and stand up "to confirm the gap in the defendant's front teeth."  We disagree.

The trial court has authority to order a case reopened for good cause even after jury deliberations have begun.  (§ 1094; *People v. Green* (1980) 27 Cal.3d 1, 42.)  We review the court's decision for an abuse of discretion.  (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1520.)  "[W]e consider the following factors:  (1) the stage the proceedings had reached when the motion was made; (2) the [party's] diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.  [Citations.]" (*Ibid*; *People v. Jones* (2003) 30 Cal.4th 1084, 1110.)

First, the request to reopen came during the first day of jury deliberations, late in the proceedings.  The reopening came from a question by the jury, and the prosecution did not object.

Second, although the prosecution did not request that Hardy display his open mouth to the jury during testimony, the prosecution cannot be charged with a lack of diligence.  Robinson testified that Hardy had a gap in his teeth and Lieutenant Oppelt testified that Robinson described his assailant as gap-toothed.[3]  The defense did not dispute that description, or attempt to show that Hardy did not match that description. The prosecution could have reasonably taken the strategic view that proving the gap in Hardy's teeth was not pivotal to its case.  Therefore, whether Hardy had a gap in his teeth

---

[3] We note that the jury merely asked to confirm the gap.  Although Hardy was not asked to show his teeth during trial, that omission does not necessarily mean that no one on the jury observed whether Hardy had a gap in his teeth, although the jury's request for Hardy to smile indicates that his appearance was at least in dispute.

10

at the time of trial was not an issue until the jury asked to see him smile.  The court reopened the evidence on its own initiative, without a request from the prosecution.

Third, "'one of the reasons underlying the requirement of diligence is that a jury may accord undue weight to evidence which is admitted close to the time deliberations begin.'" (*People v. Funes*, *supra*, 23 Cal.App.4th at p. 1521.)  Because Hardy refused to show his teeth, however, the jury could not have given undue weight to whether or not he had a gap.  Although respondent argues that as a result there was no actual new, additional evidence and the case was not "reopened," the judge's decision to allow reopening resulted in Hardy's refusal and an instruction to the jury that his refusal served as evidence of awareness of guilt.  Before Hardy's refusal, the court warned that if Hardy did refuse, "another new type of evidence which would be a type of consciousness of guilt" would result.  The risk that the jury, already engaged in deliberating, would be unduly affected by the implication that Hardy was aware of his guilt is real.

Fourth, "we must consider the significance of the evidence to the issues at trial." (*People v. Funes*, *supra*, 23 Cal.App.4th at p. 5121.)  The evidence of the gap in Hardy's teeth, while relevant, was not critical.  (See *ibid.*)  Robinson, who knew Hardy from other, earlier contacts, had identified Hardy conclusively (at the time of Hardy's arrest, and at trial) without regard to his teeth.

We conclude that the trial court did not abuse its discretion.  The jury request was late in the proceedings, but the prosecution did not seek to reopen and thus did not show a lack of diligence.  While Hardy's refusal to show his teeth (resulting in the instruction on consciousness of guilt) likely carried additional weight because it occurred during jury deliberations, the evidence was only cumulative to the considerable evidence identifying Hardy as Robinson's assailant.  Weighing these factors, it was within the trial court's discretion to reopen the evidence, particularly in response to a direct request by the jury.

The trial was not thereby rendered fundamentally unfair, and it was not reasonably probable that without the reopening, Hardy would have been acquitted.  (See *People v. Partida* (2005) 37 Cal.4th 428, 439.)  Hardy's due process rights were not violated. Further, on direct appeal, Hardy's claim of ineffective assistance of counsel fails.  "If the

record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'" (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.) Hardy suggests his counsel should have attempted to recall Robinson for cross-examination. The record does not reveal why counsel did not, nor was he asked to provide a reason. In any event, there is a readily satisfactory explanation: cross-examination of Robinson would have yielded little, given that as the judge observed Hardy did have a gap in his teeth.

**II.** **The court did not err in failing to give jury instructions on mayhem, and any error in failing to instruct sua sponte on voluntary manslaughter was harmless.**

Hardy argues that his due process rights were violated when the trial court denied his request to instruct the jury on mayhem and assault with intent to commit mayhem, and failed to sua sponte instruct the jury on attempted voluntary manslaughter. Hardy made his request during the discussion of jury instructions, and the court refused stating: "I don't think that there is substantial evidence to believe that if the jury finds the defendant guilty of anything that it's going to find him guilty of anything less than aggravated mayhem." No due process violation occurred.

"'The court must instruct on a lesser included offense, even if not requested to do, when the evidence raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense." [Citations.]' [Citation.]" (*People v. Turner* (1990) 50 Cal.3d 668, 690.) Weak evidence will not suffice. (*People v. Valdez* (2004) 32 Cal.4th 73, 116.)

"Aggravated mayhem requires proof the defendant specifically intended to maim—to cause a permanent disability or disfigurement. [Citation.]" (*People v. Szadeziewicz* (2008) 161 Cal.App.4th 823, 831.) Aggravated mayhem requires specific intent to cause a disfiguring injury; by contrast, simple mayhem is a general intent crime, requiring only general intent to cause the maiming injury. (*People v. Newby* (2008) 167 Cal.App.4th 1341, 1347; §§ 203, 205.)

12

The evidence did not justify a conviction of simple mayhem. Robinson testified that after walking toward him muttering, "'I'm going to squash this,'" Hardy threw a gallon bottle of flaming liquid at Robinson from less than two feet away, lighting him on fire, and then turned and ran. A jury could not find that Hardy did not have the specific intent to maim or disfigure Robinson and instead engaged in an indiscriminate attack, so as to be guilty of simple mayhem; instead, the evidence supported only a conclusion that the attack was "directed and controlled," for a finding of specific intent and aggravated mayhem. (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 835–836; *People v. Lee* (1990) 220 Cal.App.3d 320, 325.)

Hardy does not attempt to explain how the evidence justified convicting him of assault with intent to commit mayhem under section 220, subdivision (a)(1), so as to require an instruction on that offense, and we see no justification for that instruction. The only logical outcome of Hardy's arms-length attack on Robinson with a gallon bottle of flaming liquid was disfigurement, and the nature and extent of Robinson's injuries support only a conviction of completed aggravated mayhem.

As to attempted voluntary manslaughter, Hardy argues that the neighbor's testimony that she heard men "arguing," before she looked out her window to see Robinson aflame, supported the giving of an instruction regarding voluntary manslaughter under a theory that Hardy acted in a heat of passion or unreasonable self-defense. The neighbor, however, testified that she heard arguing every day, that she never saw Hardy outside, and she did not know how many men were arguing. Nevertheless, her testimony is some evidence that the sound of arguing preceded the attack on Robinson. While an instruction on attempted voluntary manslaughter may have been appropriate, "the failure to instruct sua sponte on a lesser included offense in a noncapital case . . . is not subject to reversal unless an examination of the entire record establishes a reasonable possibility that the error affected the outcome." (*People v. Breverman* (1998) 19 Cal.4th 142, 165.) It is not reasonably possible that a jury would have found Hardy guilty of attempted voluntary manslaughter rather than attempted premeditated murder. The method in which Hardy set Robinson on fire—throwing from

13

close range a prepared and lighted firebomb—is inconsistent with acting hastily in a heat of passion or imperfect self-defense.

**III.    Substantial evidence supported the finding that Hardy was not legally insane.**

Hardy contends that there was insufficient evidence to support the trial court's conclusion that he was legally sane. We disagree.

When a defendant pleads not guilty and not guilty by reason of insanity, the trial takes place in two phases. First, the issue of guilt is tried, and the defendant is presumed sane. (§ 1026, subd. (a); *People v. Guillebeau* (1980) 107 Cal.App.3d 531, 542–543.) If the defendant is found guilty, the issue of insanity is then tried separately to the same jury or to a different jury, in the discretion of the trial court. (§ 1026, subd. (a); *People v. Phillips* (1979) 90 Cal.App.3d 356, 362.) In this case, Hardy waived a jury on the sanity phase of trial, agreeing to a court trial.

"[A] defendant may suffer from a diagnosable mental illness without being legally insane." (*People v. Mills* (2012) 55 Cal.4th 663, 672.) To establish an insanity defense, the defendant has the burden to prove that when he committed the offense, "he . . . was incapable of knowing or understanding the nature and quality of his . . . act [or] of distinguishing right from wrong." (§§ 25, subd. (b), 29.8; *People v. Skinner* (1985) 39 Cal.3d 765, 768.) Insanity cannot be based upon an "abuse of or addiction to intoxicating substances," even if the substances caused organic damage or a mental defect or disorder persisting after the immediate effects have worn off. (*People v. Robinson* (1999) 72 Cal.App.4th 421, 427.)

We review a jury's determination of sanity under the substantial evidence test. (*People v. Belcher* (1969) 269 Cal.App.2d 215, 220.) Hardy had the burden of proving by a preponderance of the evidence that he was insane; to overturn the court's contrary finding, "we must find as a matter of law that the court could not reasonably reject the evidence of insanity." (*People v. Skinner* (1986) 185 Cal.App.3d 1050, 1059.)

Such is not the case here. Both the expert witnesses for the prosecution and for the defense concluded that although he had been diagnosed with various mental disorders, Hardy was legally sane at the time of the crime. Dr. Jaffe, the defense expert,

concluded that Hardy burned Robinson in revenge for calling him a snitch, and his running away after he threw the firebomb showed that he understood his actions were wrong. Dr. Hirsch, the prosecution expert, concluded that Hardy planned his attack on Robinson out of vengeance. Dr. Hirsch testified that although Hardy had been diagnosed with a variety of mental disorders, he understood that his behavior was wrong. Hardy's own testimony that he was not in his right mind was self-serving, and he admitted that he probably had a confrontation with Robinson.

This is ample evidence to support the sanity finding. Two experts found Hardy legally sane, contradicting and outweighing Hardy's own testimony. We will not overturn the court's finding of sanity.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


MALLANO, P. J.


ROTHSCHILD, J.


15