Filed 1/4/16  Kaur v. Lindeman CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| KULDEEP KAUR et al., | C071516 |
| Plaintiffs and Appellants, | (Super. Ct. No. CVCS090753) |
| v. | |
| MICHAEL STEVEN LINDEMAN et al., | |
| Defendants and Respondents. | |

Plaintiffs Kuldeep Kaur and her daughter, Parvinder Kaur, appeal from the judgment entered on a jury verdict in defendants' favor following trial on plaintiffs' negligence action, which stemmed from a car accident.  Plaintiffs objected to several aspects of the testimony of defendants' accident reconstruction expert witness, Kenneth Heichman, and the court conducted an Evidence Code section 402 hearing to determine whether the expert could testify and the scope of his testimony.[1]

---

[1] Undesignated statutory references are to the Evidence Code in effect at the time of the trial.

On appeal, plaintiffs contend that the trial court abused its discretion in admitting the expert testimony, arguing that: (1) the court erred in admitting Heichman's visibility study; (2) the court erred in allowing Heichman to testify about his opinions on the evidence beyond the visibility study; and (3) the court erred in allowing Heichman to opine about the mechanics of the accident because his testimony amounted to "pure unadulterated advocacy."

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Plaintiffs' Contention Regarding the Accident

On August 11, 2008, plaintiffs were injured in a car accident. At the time of the accident, Kuldeep was driving a Nissan Sentra with Parvinder in the passenger seat. Defendant Michael Steven Lindeman was driving a truck belonging to defendant Richard's Tree Service (Richard's). Plaintiffs claimed that defendants' truck came into their lane and forced their car into oncoming traffic, where it collided with Brittany Redmond's car.[2] Plaintiffs both suffered injuries. Defendants denied liability.

### Trial Testimony

Kuldeep testified that she and Parvinder were driving in the number one lane on northbound Highway 99 near Bogue Road in Yuba City. She testified that she stopped at the intersection and proceeded when the light turned green. She testified that just after crossing Bogue Road, defendants' truck began to merge into her lane from the number two lane. Kuldeep explained that because defendants' truck came into her lane, she was forced to move her car into oncoming traffic and collided with another car. Her vehicle was " 'equally side-by-side' " to the truck when the driver moved over into her lane. She testified that while the truck was moving over, she looked through the window and saw

---

[2] Redmond is not a party to this lawsuit. We discuss her testimony, *post*.

that "[t]he driver was on the phone." She had only gone approximately 150 feet from the light at Bogue Road before she was forced to move her car into the oncoming traffic lane. She described her speed as "moving slow[ly]" and "not going very fast," because she was proceeding from a stopped position after the light turned green. She said she did not see the truck signal a lane change, explaining, "I would have only seen the signal if the truck was ahead of me. I only saw the truck when it was right on the side of my car." When Kuldeep testified at her deposition, she said she could not remember whether she had stopped at the light. On cross-examination, Kuldeep denied telling the responding officer that she was passing defendants' truck at the time of the accident. Kuldeep testified that as a result of her injuries, she was bedridden for seven months following the accident and had to have two surgeries on her foot.

Parvinder testified that she and her mother had stopped at a red light at Bogue Road in the number one lane on Highway 99. She remembered that their car was the first car behind the limit line at the light but did not notice any trucks stopped at the light at that time. She testified that she did not notice defendants' truck until it started to enter the number one lane where plaintiffs' car was traveling. Their vehicle was near the front of the truck at that time. Parvinder also denied telling the responding officer that plaintiffs' car was passing the truck at the time of the accident. She suffered a fractured collarbone in the accident.

Officer Scott Bassett, the responding California Highway Patrol officer, testified that he investigated the accident. Officer Bassett interviewed Lindeman, who said that he was driving in the northbound number two lane and began to make a lane change to the number one lane. Before doing so, he looked in his mirror to check traffic in the number one lane to determine whether it was safe. He saw no vehicles that were a hazard in the number one lane and moved approximately halfway into the number one lane. Lindeman told Officer Bassett he did not see plaintiffs' car until the moment of the impact in the southbound turn lane.

3

Officer Bassett testified that both Kuldeep and Parvinder told him that their car was passing Lindeman's truck when it started to come into their lane. Bassett also testified that Redmond told him that plaintiffs' car was traveling in the northbound number one lane before it suddenly swerved into the southbound turn lane, colliding with her car. However, Redmond did not tell the officer how long she had seen plaintiff's car in the number one lane; rather she indicated everything happened very quickly.

Lindeman testified that he was driving a work truck for Richard's, traveling in a caravan of three Richard's service trucks on northbound Highway 99 in the number two lane at the time of the accident. Lindeman's truck was the last in the caravan, and it was pulling a wood chipper. He recalled that the traffic light at Bogue Road was red but turned green before the caravan of trucks passed through the intersection. Before reaching Bogue Road, Lindeman saw that Dale Cadger, the driver of the Richard's truck in front of him, put on his left-turn signal. Cadger was going to change lanes because there was a tractor-trailer combination that had been stopped at the red light and was just getting started when the light turned green. Lindeman then put on his left-turn signal as well, preparing to make a lane change together with the caravan. He explained that as the last driver in the caravan, he was supposed to make the lane change first in order to clear the lane for the other trucks to make the lane change. Before he began his lane change, he waited for traffic in the number one lane to clear. After determining that the number one lane was clear, he began to merge and moved into the lane about halfway but pulled back into the number two lane when he saw plaintiffs' car collide head-on with another car in the southbound lane. When he began to make the lane change, he did not observe any cars in the number one lane. Using the driver's side view mirror, he was able to see as far back in the number one lane as the eye could see. Lindeman testified that the first time he observed plaintiffs' car was with his peripheral vision when he saw it in the southbound turn lane, where it collided with Redmond's car. He denied using a cell phone while driving.

4

Lindeman testified that he did not see plaintiffs' vehicle in the number two lane either. Plaintiffs' counsel questioned Lindeman about how much visibility he had when using the mirrors to see directly behind the wood chipper in the same lane. Lindeman conceded that he was "not too good with math." Plaintiffs' counsel asked whether Lindeman gave correct estimates in his deposition that he could see from five to ten feet behind the wood chipper in his left mirror and ten to twenty feet behind the wood chipper in his right mirror. However, Lindeman conceded that, due to his "low level of math skills," he could not really judge the difference between 10 and 30 feet. He further testified that he had not done any tests or experiments to determine whether and how far back he could see a car traveling directly behind the wood chipper.

Cadger, the Richard's truck-driver in front of Lindeman, testified that the caravan of trucks was in the number two lane when they crossed the intersection at Bogue Road, just after the light turned green. Cadger testified that he turned on his left turn signal before passing through the intersection because there was larger vehicle with a trailer and a piece of heavy equipment at the light that was slow to get going. He saw Lindeman put on his left turn signal as well, and they waited for a long line of cars in the number one lane to pass. Before the accident, Cadger saw that the number one lane was clear and saw Lindeman's truck begin to make the lane change, get about halfway to three quarters of the way into the number one lane, and then pull back to the number two lane. He testified that he did not observe plaintiffs' car in the number one lane before the accident. He said plaintiffs' car appeared to "whip around" the Lindeman truck. He conceded he did not actually see from where plaintiff's vehicle had come, but saw that the number one lane was clear when Lindeman began to make the lane change, and he then observed plaintiffs' vehicle in the oncoming lane, beside and a little behind Lindeman's truck. He said plaintiff's vehicle had "come around" and went into the southbound turn lane where it collided head-on into a black Ford Focus. Cadger also testified that, in his experience, there is a blind spot directly behind the Lindeman truck while towing a wood chipper.

5

Redmond testified that she was traveling in the southbound number one lane of Highway 99 just before the accident. She entered the turn lane near the intersection of Bogue Road. She did not see plaintiffs' car until she entered the southbound turn lane just before the collision, and she never saw plaintiffs' car in the northbound number one lane. When asked whether she told an officer that plaintiffs' vehicle was traveling northbound in the number one lane and suddenly swerved into her lane, Redmond said she did not remember telling the officer what lane the car had been in, but did remember telling him that the car was traveling northbound. She conceded her memory was fresher when she talked to the officer. But she also testified she only saw plaintiffs' vehicle for "about a second" before the collision, and really did not see from where it came.

John Bybee testified that he was a passenger in a work vehicle proceeding in the opposite direction in the southbound number two lane about eight to ten cars back from the collision. He testified that he observed plaintiffs' car traveling at a 45-degree angle into the turn lane and collide with Redmond's car. Bybee said plaintiffs' car was traveling at a "high rate of speed" and that it was coming in his direction, but the car it hit was between plaintiff's car and the vehicle in which Bybee was riding. Bybee said he did not see plaintiffs' vehicle before he saw it at the 45-degree angle, and he did not see any vehicles or anything else that would cause plaintiffs' car to veer into the turn lane. Bybee was familiar with Richard's trucks and he did not notice any in the northbound lanes.[3]

Similarly, Floyd Perry testified that he was driving in the southbound number one lane when he saw plaintiffs' car enter the southbound left turn lane from the northbound side at a "pretty drastic angle." He explained that the odd angle drew his attention to the car in the moments before the collision, but he could not be sure whether it was as much as a 45-degree angle. However, he testified that "[i]t was like it just came out of nowhere

---

[3] Bybee happened to be a former employee of Richard's Tree Service. He last worked for Richard's 20 years prior to the trial. He did not leave under happy circumstances.

6

and impacted the car in the turn lane turning left onto Bogue." Perry did not see any reason why plaintiffs' car veered at that angle. He testified that he had a clear view of the accident scene and did not see any Richard's trucks anywhere near plaintiffs' car before the crash. He only noticed the Richard's trucks after they pulled over "up the road" after the collision.

Ralph Gault testified that he was turning his car into the southbound left turn lane behind Redmond's car just before the collision. He said that as he pulled up to make the left turn, he "looked around at everything." He testified that plaintiffs' car was traveling straight in a northbound lane and then came into the southbound turn lane "pretty quickly" and it looked like the driver had "lost control" of the car. The car had caught his attention because it "seemed to be traveling faster than the rest of the cars." He testified that plaintiffs' car "changed angles very quickly" by approximately 30 degrees. He described the movement of plaintiffs' car as "shooting across and hitting the lady in front of [him]." He did not see any other vehicles pull in front of plaintiffs' car or otherwise cause the car to veer into the turn lane. He explained that plaintiffs' car stood out to him because it was traveling faster than the other cars around it. When asked whether he noticed a Richard's truck pulling a wood chipper, Gault said, "Yeah. . . . That was the last vehicle and it was kind of already kind of leaving my view to my left. It had already kind of went by . . . ." Gault further said the Richard's truck was not near plaintiffs' vehicle; rather "[t]here seemed to be a lot of distance between the [two]." On cross-examination, Gault said he saw plaintiff's vehicle traveling in the northbound lane, and when asked whether the car was traveling in the northbound number one lane for 100 yards, Gault replied, "Yeah, maybe."

Fred Cox, one of the Richard's owners, testified that Lindeman's truck was equipped with "fisheye" mirrors affixed to the side rearview mirrors, which allow the driver to see wider angles on either side of the truck. Cox testified that in his experience driving the Richard's trucks with these mirrors, there is no blind spot on the left side of

7

the truck and a driver of this truck in the number two lane would have a clear view of vehicles in the number one lane. Plaintiffs' counsel asked Cox if he had personally tested that claim, and he responded that he had not.

However, after his testimony, Cox decided to test whether there was a blind spot in the Lindeman truck's mirrors. Cox explained that because of the cross-examination, he became concerned about whether his vehicles were safe, so he wanted to check for himself. During the following day of trial when the examination by plaintiffs' counsel resumed, Cox testified that after the previous court session, he pulled out the truck Lindeman had been driving and the chipper to conduct an experiment to see whether one could see a vehicle behind and to the left of the truck and wood chipper combination and also directly behind using the driver-side mirror. He set the side mirrors as they would normally be set.[4] First, Cox placed a small car in four different positions behind and on the left side of the Lindeman truck and wood chipper combination. Cox described his placement of the small car as "like somebody would be passing you." He testified that there was no blind spot when the small car was on the left side of the truck; he could see the small car in every position with the regular box mirror, and the small car was "very visible" in the fisheye mirror. Cox said he next positioned the small car directly behind the wood chipper. While at 40 to 50 feet,[5] the small car could be seen if it was to the left as if it was in the number one lane, it could not be seen when it was as close as 40 to 50 feet directly behind the wood chipper. Cox disagreed with what Lindeman had said during his deposition about being able to see a vehicle five to ten feet directly behind the

---

[4] Cox explained that the mirrors are approximately 16 inches tall. He indicated the mirrors do not move up and down like the small mirrors on a "regular vehicle." Any adjustments are made by moving the mirrors sideways.

[5] Cox said he did not use a measuring device. He "stepped it off."

wood chipper.[6]  At 40 feet, he could "barely see" one side of the small car.  Based on this experiment, Cox opined that a driver of the truck would not be able to see a vehicle traveling close behind the wood chipper in the same lane, "[j]ust like any big truck."

Kenneth Heichman, an accident reconstruction expert, testified that he was retained by defendants to evaluate the car accident.[7]  He testified that he was a former police officer and sheriff's deputy with extensive experience in vehicle accident investigation and reports, and he began consulting on accident investigation and reconstruction in 1991.  He holds a two-year math and science degree from Cosumnes River College.  He testified that he has attended somewhere between 500 and 1,000 hours of classroom instruction on vehicle accident investigation, reconstruction, applied physics, collision biomechanics, crush analysis, and seatbelt analysis.  He belongs to several organizations, where they regularly crash vehicles, take data, and work backwards to determine vehicle speeds and what happened.  At defense counsel's request, he performed a visibility study using a car equivalent in size to plaintiffs' car, a truck identical to Lindeman's truck,[8] and the same wood chipper that was towed by the truck on the day of the accident.  He testified that he found that when a vehicle the size of plaintiffs' car is between 65 feet and 125 feet directly behind the wood chipper, there is a blind spot.  He explained that at 65 feet, the vehicle is not visible and at 125 feet the

---

[6]  He also disagreed with Lindeman's deposition testimony that one could see a vehicle as close as 10 to 20 feet behind the chipper using the right-side mirror.  He said he did not think it was possible to adjust the right-side mirror so that it was possible to do so.

[7]  Plaintiffs did not retain their own accident reconstruction expert.

[8]  Heichman testified that after plaintiffs' counsel questioned his use of a different truck during his deposition, he inspected both trucks, which were the same make and model, and he determined that they had the same measurements and specifications.  He testified that "[t]hey were the same vehicles just with different numbers and different amounts of chipped paint on them."

vehicle is completely in view. Based on his visibility study and his review of the witnesses' testimony, Heichman opined that plaintiffs' car probably came from the northbound number two lane behind Lindeman's truck in his blind spot, moved into the number one lane in an attempt to pass the truck at the same time that Lindeman began to make a lane change, and then swerved into the southbound turn lane where it collided with Redmond's car.

Heichman further opined that based on the lay witnesses' testimony about the angle of plaintiffs' car when it entered the southbound turn lane, plaintiffs' testimony that they started in the number one lane did not make any sense. He testified that the angle witnesses described was "too steep an angle to allow a vehicle to even retain traction and continue in a straight line to collision. [¶] . . . [¶] . . . the greater the angle with diminishing the lateral movement, the vehicle's going to spin out." Additionally, as Heichman explained, the angles of 33 degrees, 45 degrees, or even 20 degrees indicated that the lateral movement of plaintiffs' vehicle had to be more than one car length.[9] Heichman also opined that if plaintiffs' vehicle was in the number one lane and Lindeman or Cadger had looked, they would have seen the vehicle. Accordingly, Heichman opined that "in all probability Ms. Kaur had started her swerve maneuver from the number [two] lane, crossed the number [one] lane, [and] crossed . . . into the southbound left turn lane when the collision occurred." Heichman testified that he could not rule out that Kuldeep turned the steering wheel suddenly when she claimed the

---

[9] Heichman also opined that it was not possible that plaintiffs' vehicle was traveling 100 yards in the northbound number one lane and then veered off as suggested by Gault's testimony. The angles described by the witnesses were too steep for that to have happened. Heichman testified that if plaintiffs' car was traveling for 100 yards in the northbound number one lane and then veered into the southbound turn lane, the angle would have been "substantially shallower" than what the witnesses described.

10

Richard's truck entered into her lane, but if she did that from the number one lane, he would not expect she would have done so at the angles described by the witnesses.

**The Verdict and Post-trial Motion**

The jury rendered its verdict after approximately 30 to 45 minutes of deliberation, finding that defendants were not negligent by a vote of 12 to 0.

Subsequently, plaintiffs filed a motion for new trial, raising various errors related to the admission of Heichman's testimony. This motion was apparently denied.[10]

## DISCUSSION

### I. Standard of Review

Plaintiffs claim the trial court erred in admitting several aspects of Heichman's testimony. "A trial court's ruling on the admissibility of evidence is generally reviewed for abuse of discretion." (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476.) " ' "The burden is on the party complaining to establish an abuse of discretion . . . ." ' [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 331.) " 'An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice. [Citations.] The abuse of discretion standard affords considerable deference to the trial court, provided that the court acted in accordance with the governing rules of law.' " (*Kayne v. The Grande Holdings Limited* (2011) 198 Cal.App.4th 1470, 1474-1475.)

---

[10] The trial court's order is not part of the record on appeal. Plaintiffs' citation to the record regarding the court's ruling on their motion for new trial appears to be related to a "hearing for monitoring of payments" and does not mention the motion for new trial.

## II. The Visibility Study

### A. Additional Background and the Parties' Contentions

Prior to trial, plaintiffs filed a memorandum challenging Heichman's proposed testimony on the blind spot behind the truck and wood chipper combination driven by Lindeman and requesting a section 402 hearing on the admissibility of this testimony. Plaintiffs contended that Heichman's visibility study was inadmissible because he used a different truck than the one involved in the accident.[11] Plaintiffs argued that Heichman's testimony was also inadmissible because he was a different height than Lindeman and could not say whether the mirrors on his exemplar truck were in the same position as the mirrors on the Lindeman truck at the time of the accident. Based on these differences and the positioning of the mirrors, plaintiffs contended Heichman's testimony lacked foundation. Plaintiffs also argued that Heichman's testimony would contradict Lindeman's deposition testimony about his visibility behind the wood chipper.

The trial court held a section 402 hearing outside of the presence of the jury to evaluate Heichman's proposed testimony. Heichman was examined on his background, training, experience, the visibility study, and how he arrived at his opinions in this case. He testified that he was not attempting to duplicate highway conditions but simply attempting to determine whether or not there was a blind spot behind the truck and wood chipper, and if so, where it was located. Plaintiffs then raised another objection to the scope of Heichman's proposed testimony, contending that he could not use the visibility study "as a springboard for opinions" about where plaintiffs' car came from. The trial court then discussed the scope of defendants' expert witness disclosure statement, noting that it broadly included "the idea of where the vehicle came from and when it could be seen and more the dynamics of the accident as opposed to [only] the existence of a blind

---

[11] In a footnote, plaintiffs acknowledged that Heichman did evaluate the actual Lindeman truck after the deposition.

12

spot."[12]  The trial court then ruled that the disclosure statement governs the scope of the expert testimony and ruled that the disclosure statement was broad enough to cover the proposed testimony.  The court noted that if, during trial, Heichman started to testify about matters outside the scope of the disclosure statement, the court would consider any further objections at that time.  The court then returned to the basis for the section 402 hearing, the admissibility of Heichman's testimony about the visibility study, and ruled that "the conditions of the experiment conducted by this witness were substantially similar to those that gave rise to things that are relevant to this incident or this accident; i.e., the nature and extent and existence of the blind spot," and thus admissible evidence.

On appeal, plaintiffs contend that the trial court erred in admitting Heichman's testimony about his visibility study because the conditions of the study were not substantially similar to those during the collision.  We disagree.

## B.  Analysis

"It is settled that a trial court has discretion to admit 'experimental' evidence.  The proponent of such evidence bears the burden of production and proof on the question whether such evidence rests upon an adequate foundation.  'Admission of such evidence depends upon proof of the following foundational items:  (1) [t]he experiment must be relevant; (2) it must have been conducted under at least substantially similar, although not necessarily absolutely identical, conditions as those of the actual occurrence; (3) the

---

[12]  Indeed, the attorney declaration attached to defendants' disclosure statement stated that Heichman was "expected to testify as to *his evaluation of the subject accident*, the forces involved *and visibility issues*."  (Italics added.)  In his declaration in support of the subsequent motion for a new trial, plaintiffs' counsel admitted that he did not read defendants' expert witness disclosure statement before trial.  Counsel attested, "I admit I did not specifically read Mr. Rushford's accompanying declaration with the phraseology as to what Mr. Heichman was going to testify to.  [¶]  In my mind I had covered Mr. Heichman's testimony by his deposition and asked if he were going to supplement his report that I be allowed to re-depose."

qualifications of the individual testifying concerning the experimentation must be demonstrated with some particularity; and (4) evidence of the experiment will not consume undue time, confuse the issues, or mislead the jury.' [Citations.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1326 (*Bradford*).) The trial court's decision as to the admissibility of experimental evidence is reviewed for abuse of discretion. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1120.)

We conclude the trial court did not abuse its discretion. The visibility experiment had probative value because it showed that it was possible that plaintiffs' car was traveling in a blind spot behind the Lindeman truck in the number two lane. This point was certainly relevant to the question of how plaintiffs' car may have achieved a 30- or 45-degree angle when it entered the southbound turn lane, and it was also relevant to substantiating Lindeman's and Cadger's claims that they never saw plaintiffs' car traveling in either northbound lane before the accident.

While plaintiffs briefly mention relevance, their chief complaints pertain to the second *Bradford* criterion, substantial similarity.[13] Plaintiffs argue that because Heichman used a different (albeit identical) truck as an exemplar, did not adjust the mirrors during the experiment, did not account for the height of the driver, and did not conduct the experiment under highway conditions, the conditions of his experiment were not substantially similar to those of the accident. However, these are not necessarily crucial variables that would require us to conclude that the trial court abused its discretion in admitting the evidence. The primary purpose of the experiment was to determine whether there was a blind spot behind the truck and wood chipper. While Heichman determined that the blind spot was a different distance from the wood chipper than

---

[13] Plaintiffs do not assert that the other foundational criteria set forth in *Bradford* were not satisfied. Accordingly, we need not address the expert's qualifications and whether the testimony would consume undue time, confuse the issues, or mislead the jury.

14

Lindeman's or Cox's estimations as lay witnesses, Lindeman, Cox, and Cadger *all* agreed with Heichman that there was a blind spot behind the truck, which was the salient point. The variables plaintiffs identify between the conditions of the experiment and those of the accident were more pertinent to the precise location of the blind spot under highway conditions rather than its existence.

Further, plaintiffs' contention that Heichman's visibility experiment findings contradicted Lindeman's estimate of his own visibility and were therefore inadmissible is unpersuasive. Lindeman himself expressed uncertainty in his estimate, explaining that he struggled with math and could not judge the difference between 10 and 30 feet. When plaintiffs' counsel questioned Heichman during voir dire about why his expert testimony was needed on this issue after Lindeman provided an estimate, Heichman responded, "[F]or the simple reason that you can't sit in the truck and accurately determine what you can and can't see behind you unless you get out and measure it." Finally, plaintiffs offer no authority standing for the proposition that an expert's experiment is only admissible if it is consistent with other witness testimony. Accordingly, plaintiffs' argument on this point is not well-taken.

As discussed, *ante*, the critical issue was whether plaintiffs' car *could have been* in a blind spot somewhere behind the wood chipper, not its precise distance behind the wood chipper. Heichman explained that if there was such a blind spot, it would reconcile the various witness's testimony. Further, with respect to the inconsistent testimony about the location of the blind spot, the differences between the conditions of the experiment and the conditions existing at the time of the collision were emphasized by defense counsel during a thorough cross-examination of the expert. Jurors heard testimony from both Lindeman and Cadger about the blind spot in their experience driving the truck, and they heard testimony from Cox and Heichman providing different estimates on the location of the blind spot based on their experiments. The jurors could readily understand these differences and take them into account in determining the weight to be

15

given to Heichman's visibility study findings. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 950; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1115-1116.) There was no abuse of discretion.

## C. Prejudice

Even if we were to find error in the admission of Heichman's challenged testimony, that error would not justify reversal of the judgment because it is not reasonably probable plaintiffs would have obtained a more favorable result in the absence of the challenged testimony. "An evidentiary ruling, even if erroneous, is not reversible absent a miscarriage of justice. [Citations.] '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.]" (*Easterby v. Clark* (2009) 171 Cal.App.4th 772, 783, citing *People v. Watson* (1956) 46 Cal.2d 818, 836; see § 353, subd. (b).) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could do*, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

Plaintiffs have not demonstrated prejudice. Indeed, plaintiffs do not discuss the miscarriage of justice test in their opening brief. After the miscarriage of justice requirement was noted by defendants in their respondent's brief, plaintiffs mention the phrase in their reply brief in the form of a question, "No miscarriage of justice?" but ignore the evidence exonerating defendants from liability and provide *no* analysis of how a more favorable result was probable absent Heichman's testimony. Accordingly,

16

plaintiffs' conclusory argument that this case is an example of " '[e]xpertitis' run amuck . . . constituting reversible prejudicial error" is unpersuasive. "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' [Citations.]" (*In re S.C.* (2006) 138 Cal.App.4th 396, 408; see also *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4 [disregarding claims perfunctorily asserted without development].) Plaintiffs have thus failed to bear their burden on appeal of showing that there was a miscarriage of justice.

In any event, we do not see how plaintiffs could show a reasonable probability that they would have obtained a more favorable result absent Heichman's testimony, and perhaps that explains why they did not try to do so. The properly-admitted evidence supporting defendants' version of events was strong, where virtually all of the eye witnesses except plaintiffs testified that wherever plaintiffs' car came from, it caused the accident and there was nothing they could see that caused plaintiffs' car to suddenly travel into the southbound turn lane. Though Kuldeep and Parvinder indicated their vehicle was alongside the front of Lindeman's truck when Kuldeep purportedly moved to the left to avoid being hit (Kuldeep even claimed she was able to see Lindeman talking on the phone), no other witnesses saw Lindeman's truck near plaintiffs' vehicle when plaintiffs' vehicle traveled in the direction of the point of impact in the southbound turn lane. Bybee did not notice any Richard's trucks when he noticed plaintiffs' car and saw nothing that would cause plaintiffs' car to veer into the southbound turn lane. Similarly, Perry testified that he had a clear view of the accident scene, saw no Richard's trucks near plaintiffs' vehicle before the collision, and saw no reason why plaintiffs' vehicle veered off into the turn lane at what he described as a "pretty drastic angle." Gault testified that as he pulled into the turn lane behind Redmond, he "looked around at

17

everything," and he did not see any vehicles pull in front of plaintiffs' vehicle or otherwise cause plaintiffs vehicle to collide into the vehicle ahead of him. He had noticed a Richard's truck pass by, but it had already gone by him before plaintiffs' vehicle traveled toward the turn lane. Gault further testified that there seemed to be a lot of distance between the Richard's truck and plaintiffs' car.

Moreover, there was testimony from other witnesses that was consistent with Heichman's opinion that plaintiffs' car was traveling in the number two lane behind the Lindeman truck before veering into the southbound turn lane. Cadger testified that he did not see plaintiffs' car in the number one lane but observed it "whip around" the Lindeman truck just before the collision. In describing the movement of plaintiffs' car Perry testified, "[i]t was like it just *came out of nowhere* and impacted the car in the turn lane turning left onto Bogue." (Italics added.) Redmond testified that she never saw plaintiffs' car traveling in the number one lane, really did not see from where it came and that she only saw it for a "about a second" before it collided into her. Bybee testified that plaintiffs' car traveled into the southbound turn lane at a 45-degree angle while Perry described the angle as "drastic." Gault testified that plaintiffs' car "changed angles very quickly," by approximately 30 degrees. Bybee said he did not see plaintiffs' car before he saw it traveling at a 45-degree angle. And while Kuldeep maintained she was "moving slow" and "not going very fast" at the time of the collision because she had only traveled approximately 150 feet from where she purportedly waited for the light at Bogue Road, Bybee testified that plaintiffs' vehicle was traveling at a "high rate of speed," and Gault testified it "seemed to be traveling faster than the rest of the cars." Similar to Heichman, Cox testified that he too determined there was a blind spot behind the chipper, although he measured it at 40 to 50 feet. All of this testimony supports the conclusion that plaintiffs' car was traveling behind the wood chipper, out of the field of vision of the witnesses until it caught their attention when it quickly angled off to the left and collided with Redmond's vehicle in the turn lane for the opposite direction of traffic. Finally,

18

Officer Bassett testified that Kuldeep and Parvinder told him that their car was passing Lindeman's truck when it started to come into their lane, which further tends to support a finding, consistent with Heichman's opinion, that plaintiffs' car came from the number two lane at the same time Lindeman began to change lanes, at which point plaintiffs' vehicle then traveled at a "steep" angle into the southbound turn lane where it collided with the Redmond vehicle.

### III. Expert Testimony Beyond the Visibility Study
### A. Additional Background and the Parties' Contentions

At trial, following Heichman's testimony about his visibility study findings, defense counsel asked Heichman whether he formed an opinion about where plaintiffs' car "had come from" (i.e., whether plaintiffs' car was traveling in the number one lane or had crossed into that lane from the number two lane to pass the Lindeman truck just before the accident). Plaintiffs' counsel objected, "He's doing a[] visibility study, not directions of cars and, then, whatever. He can tell the people the visibility studies he's done; that's the scope of his report. And for now to go further is not within the scope of his report." The trial court overruled this objection.[14]

On appeal, plaintiffs contend that the trial court erred in admitting Heichman's testimony about his opinions on the evidence beyond the visibility study. In particular, they contend that "Heichman had not been employed by defendant[s] other than to do a visibility study." In making this argument, plaintiffs suggest that even if Heichman's testimony about his visibility study was properly admitted, he could not testify as to any opinions about the cause of the accident. Conversely, defendants contend that "the scope

---

[14] As discussed, *ante*, when plaintiffs raised the same objection during the section 402 hearing, the court overruled the objection and explained that the scope of the expert's testimony was governed by the broad expert witness disclosure statement. The disclosure statement asserted that Heichman was "expected to testify *as to his evaluation of the subject accident*, the forces involved *and visibility issues*." (Italics added.)

of the expert's employment and testimony is governed by the expert witness disclosure," which was broad enough to include Heichman's opinions. We agree with defendants.

## B. Analysis

"Frequently, a controlled experiment may be conducted in an effort to have a particular circumstance of a case replicated. An expert may then testify about the results. Based on those results, the expert may further offer an opinion regarding how the actual circumstances of the case occurred." (*People v. Guillebeau* (1980) 107 Cal.App.3d 531, 550.) Heichman offered an opinion based on the results of his experiment here and the witness statements. Plaintiffs' contention that his opinion amounted to "[s]andbagging" is unpersuasive, particularly where his proposed testimony was adequately conveyed to plaintiffs in defendants' expert witness disclosure statement, which plaintiffs' counsel later admitted he did not read before trial. Moreover, Heichman's testimony at trial regarding the collision did not deviate from his testimony during his deposition.[15] Yet, plaintiffs contend Heichman's "employment [] mission" of conducting a visibility study "morphed" into a second "mission" of opining that plaintiffs' car was in Lindeman's blind spot before the accident. Even if this were the case, plaintiffs cite no pertinent authority for the proposition that an expert hired to do an experiment cannot form other opinions based on that experiment where the expert otherwise meets the requirements of section 801 and is properly disclosed.

---

[15] For example, at the deposition, Heichman explained that plaintiffs' claim that their vehicle was right next to the truck was inconsistent with the visibility study and the angle their vehicle traveled just prior to the collision according to the witnesses. He also testified, "I just know that at some point in time [Kuldeep] was probably behind the chipper, behind the Lindeman vehicle in the [number two] lane not visible to him and then went out to -- either started to pass at the same time that [Lindeman] was moving over, or made the turn into the [number one] lane as he was moving over, and she swerved into the southbound lane to strike Redmond."

Further, even if we agreed with plaintiffs that the court erred in admitting Heichman's testimony, as discussed, *ante*, plaintiffs have failed to demonstrate prejudice under the harmless error test. Accordingly, there is no reversible error.

## IV. Expert Testimony as Purported Advocacy

"[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. . . . [¶] . . . [¶] . . . The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies. Rather, it conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory . . . is valid.' [Citation.]" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772 (*Sargon*).) "[E]ven when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise. [Citation.] For example, an expert's opinion based on assumptions of fact without evidentiary support . . . or on speculative or conjectural factors . . . has no evidentiary value . . . and may be excluded from evidence. [Citations.]" (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 (*Jennings*).)

On appeal, plaintiffs appear to challenge Heichman's testimony based on its purported lack of evidentiary support or reliance on speculative matters. They contend that the court erred in allowing Heichman to opine about the mechanics of the accident because his testimony was insufficiently supported and thus, "nothing more than pure unadulterated advocacy." In particular, plaintiffs contend that it was an abuse of

21

discretion to allow Heichman to testify that plaintiffs' car likely originated from the number two lane in Lindeman's blind spot because this testimony "theorize[d] upon the mechanics of the accident" without "enough information" to rule out other possibilities.

While plaintiffs do not make the arguments discussed in *Jennings* with any specificity in their appellate briefs, they do generally contend that Heichman's opinion was insufficiently supported by the evidence. This argument could have formed a basis for an objection, as discussed in *Jennings*; however, plaintiffs failed to raise this objection below. While plaintiffs objected to Heichman's visibility experiment and objected that Heichman's opinion testimony exceeded the scope of his employment, they never objected to Heichman's testimony as speculative or lacking evidentiary support.

Section 353 provides in pertinent part, "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and *so stated as to make clear the specific ground of the objection or motion . . . .*" (Italics added.) In accord with this statute, our high court has consistently held that a " ' "defendant's failure to make a timely and *specific* objection" on the ground asserted on appeal makes that ground not cognizable. [Citation.]' " (*People v. Partida* (2005) 37 Cal.4th 428, 433-434, italics added.) Accordingly, plaintiffs' third argument is precluded from appellate review where the record does not disclose a specific objection on this ground and plaintiffs' appellate briefing does not contend any such objection was raised.

Even if the objection were not forfeited, we would conclude that Heichman's opinion is supported by his blind spot study and the witness statements upon which he relied. This information provided a "reasonable basis" for his opinion. (*Sargon*, *supra*, 55 Cal.3d at p. 722.) His opinion was not at all "based on a leap of logic or conjecture." (*Ibid*.) Nor was the testimony " 'clearly invalid and unreliable.' " (*Ibid*.) The trial court

performed its gatekeeping function here.  It did not abuse its discretion in admitting Heichman's opinion testimony.  (*Id*. at pp. 722-723.)

## DISPOSITION

The judgment is affirmed.  Plaintiffs shall pay defendants' costs on appeal.  (See Cal. Rules of Court, rule 8.278(a)(1), (5).)


                                                       MURRAY       , J.


We concur:


      MAURO       , Acting P. J.


      DUARTE      , J.