Filed 8/10/23  P. v. Gudino CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>DANIEL ANTONIO GUDINO,<br><br>      Defendant and Appellant. | A163496<br><br>(City & County of San Francisco Super. Ct. Nos. 232869, 20004694) |

In a bifurcated trial, a jury found defendant Daniel Antonio Gudino guilty of murdering his mother.  (Pen. Code, §§ 187, subd. (a), 1026, subd. (a); undesignated statutory references are to this code.)  The People and Gudino subsequently stipulated he was not guilty by reason of insanity, and he was committed to the State Department of State Hospitals.  On appeal, Gudino argues the trial court committed instructional error, erroneously admitted lay witness opinion testimony and a graphic photo of the victim, and erred by notifying the jury of the second trial phase addressing sanity; he also raises a claim of prosecutorial misconduct.  We affirm.

## BACKGROUND

Gudino had a history of episodes where he was very anxious and paranoid.  He would make nonsensical statements, and he was occasionally hospitalized.  In 2018, Gudino received inpatient treatment after exhibiting irritability, grandiosity, and paranoid, delusional thinking.  He was

1

diagnosed with bipolar disorder and manic episodes. In 2018 or 2019, he reportedly shoved or grabbed his mother and threatened to kill her. He nevertheless lived with her after a 2019 hospitalization.

On April 12, 2020, Gudino was feeling stressed and nervous as he had been for several months. He was concerned about the reported COVID-19 death rate among the Latino population. Moreover, after reading social media posts about cannibalism, he became paranoid his mother and sister were going to poison him. For three to five days, he was unable to sleep. A few days prior, he smoked a substance he believed may have been laced with fentanyl — he felt strange and was not breathing normally. In addition, he stopped taking his psychiatric medication for approximately three weeks because he suspected his sister was lacing it.

The morning of April 12, Gudino showered and wiped his face with a towel. Feeling dizzy and his heart race, he suspected his sister placed fentanyl on his towel. He asked his mother, who was sleeping in her bed, whether she or his sister placed something on the towel. When she denied doing so, he choked her until she stopped breathing. At that point, he believed she was an artificial human controlling him. He hit her several times with a baseball bat and used a drill to drill into her body, killing her. Believing he needed to burn the house down, he went to the kitchen, lit a rag, and threw it on his mother.

A smoke alarm in the house went off, and a neighbor called 911. Officers responded and eventually handcuffed Gudino, who was naked and covered in blood on the porch. He told officers his sister put a spell on his mother. He was agitated and expressed concern officers would kill him. Shortly after, he said, "Oh my God, I can't believe I fucking did that to my mom" and "Fuck. Why did I kill my fucking mom, man." After his arrest, he

2

was initially treated in a psychiatric hospital where he was diagnosed with bipolar disorder with severe psychotic features and determined to be in acute psychiatric crisis. The hospital medicated him with antipsychotic drugs to address his paranoid delusions.

Gudino was charged with murder, and he pled not guilty by reason of insanity. (§ 187, subd. (a).) In a bifurcated trial, a jury found him guilty of second degree murder. The jury was unable to reach a unanimous verdict on his sanity during the second phase of trial, and the trial court declared a mistrial. It subsequently accepted the parties' stipulation Gudino was not guilty by reason of insanity. (§ 1026.) The court committed him to the State Department of State Hospitals and set a term of 15 years to life.

## DISCUSSION

Gudino raises several claims and contends the guilty verdict must be reversed. We address each claim in turn and conclude that none, taken either individually or cumulatively, warrants reversal.

### I.

Gudino contends the trial court erred by instructing the jury with a modified version of CALCRIM No. 3425 — the pattern jury instruction for the unconsciousness defense — because it was misleading and a misstatement of the law, thus violating his due process rights. We conclude, when considered in their totality, there was no reasonable likelihood the jury misunderstood the instructions.

We review the correctness of the jury instruction de novo, consider the instructions as a whole, and examine whether the instructions fully and fairly instructed the jury on the applicable law. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) We ask whether there was a reasonable

3

likelihood the jury applied the challenged instruction in a way that violated that constitution or state law. (*People v. Ayala* (2000) 24 Cal.4th 243, 289.)

Unconsciousness is generally a complete defense to all charges. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417.) Unconsciousness need "not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' " (*Ibid.*) An unconscious act is committed by a person " 'who because of *somnambulism*, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional.' " (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1315 (*Mathson*).) Consciousness is not an element of any crime; once a defendant raises the unconsciousness defense, the prosecution assumes the burden of disproving unconsciousness. (*Id.* at p. 1321.)

During Gudino's jury trial, he presented evidence and argued he killed his mother during a psychotic episode while in a state of unconsciousness. Rather than providing the jury with Gudino's proposed instruction, the trial court used the following version of CALCRIM No. 3425:

> The defendant is not guilty of a violation of Penal Code section 187 if he acted while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. Someone may be unconscious even though able to move.
>
> Unconsciousness may be caused by a severe mental disorder including, but not limited to, psychosis, schizoaffective disorder, or bipolar disorder.
>
> The People must prove beyond a reasonable doubt that the defendant was conscious when he acted. If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious, you should conclude that he was conscious. If you have a reasonable doubt that he was conscious, then you must find

4

him not guilty. You must base your decision on all of the evidence.[1]

Viewed in context and in its entirety, this instruction correctly states the law regarding the unconsciousness defense. By explaining Gudino is not guilty of section 187 if he acted while unconscious, the instruction properly explained unconsciousness is a complete defense to his charged offense, second degree murder. (*People v. Halvorsen*, *supra*, 42 Cal.4th at p. 417.) The instruction further provided the jury with the criteria for finding a defendant unconscious and explained someone might be unconscious even if otherwise able to physically act — "[s]omeone is unconscious when he or she is not conscious of his or her actions. Someone may be unconscious even though able to move." (*Ibid.*) In addition, it correctly placed the burden on the prosecution for disproving Gudino's unconsciousness defense — "[t]he People must prove beyond a reasonable doubt that the defendant was conscious when he acted." (*Mathson*, *supra*, 210 Cal.App.4th at p. 1321.)

---

[1] Unmodified, CALCRIM No. 3425 states: "The defendant is not guilty of <insert crime[s]> if (he/she) acted while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. [Someone may be unconscious even though able to move.]

Unconsciousness may be caused by (a blackout[,]/ [or] an epileptic seizure[,]/ [or] involuntary intoxication[,]/ [or] <insert a similar condition>).

[The defense of unconsciousness may not be based on voluntary intoxication.]

The People must prove beyond a reasonable doubt that the defendant was conscious when (he/she) acted. If there is proof beyond a reasonable doubt that the defendant acted as if (he/she) were conscious, you should conclude that (he/she) was conscious, unless based on all the evidence, you have a reasonable doubt that (he/she) was conscious, in which case you must find (him/her) not guilty."

Relying on *Mathson*, Gudino nonetheless contends the modified instruction sentence — "If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious, you should conclude that he was conscious" — is an incorrect and misleading statement of law. He argues it precluded the jury from finding he was unconscious because he engaged in overt acts of a conscious person, i.e., the instruction erroneously created a presumption of consciousness based solely on the fact he acted *as if* he were conscious. We disagree. We note CALJIC No. 4.31 contains nearly identical language and is the immediate predecessor to CALCRIM No. 3425. (*Mathson, supra*, 210 Cal.App.4th at p. 1321.) Regarding CALJIC No. 4.31, our high court rejected the arguments Gudino now advances. (*People v. Babbitt* (1988) 45 Cal.3d 660, 690–691, 695–696.) It explained the instruction's language does "little more than guide the jury as to how to evaluate evidence bearing on the defendant's consciousness and apply it to the issue, an issue that is capable of proof only by circumstantial evidence of the defendant's conduct." (*Id.* at p. 696.)

Moreover, *Mathson*'s concern was not with the foregoing language, but rather that it was immediately followed by the following sentence: " '*If however*, based on all of the evidence you have a reasonable doubt that he was legally conscious, you must find him not guilty.' " (*Mathson, supra*, 210 Cal.App.4th at p. 1322, some italics omitted.) (As here, a modified version of CALCRIM No. 3425 was given in *Mathson*.) *Mathson* explained that " '[i]f, however' " understood in context "could mean that the jury is *only* to consider whether there is reasonable doubt based on the other evidence *if* it finds that a defendant acted as if he was not conscious." (*Mathson*, at p. 1323, italics added.) Thus, " '[i]f, however,' " could be misinterpreted to create a condition precedent — that is, the language did not sufficiently

6

explain to the jury that it may entertain a reasonable doubt regarding a defendant's consciousness even though the defendant was acting as if he were conscious. (*Ibid.*)

We find no such error here, and *Mathson* does not alter our conclusion. The jury was not instructed to find Gudino conscious based on the fact that he could physically move during the offense. To the contrary, the instruction explained "[s]omeone is unconscious when he or she is not conscious of his or her actions. Someone may be unconscious even though able to move." Nor did the instruction require Gudino to persuade the jury he was in fact unconscious. While it told the jury to presume Gudino was conscious if there was proof beyond a reasonable doubt that he acted as if conscious, the jury was nonetheless *required* to find Gudino not guilty if he raised a reasonable doubt that he was in fact conscious at the time of the offense. (*Mathson*, *supra*, 210 Cal.App.4th at p. 1323; *People v. Babbitt, supra*, 45 Cal.3d at p. 696.) We discern no reasonable likelihood the jury applied the challenged instruction in a way that violates the Constitution. (*People v. Ayala, supra*, 24 Cal.4th at p. 289.) None of Gudino's cited authorities alter this conclusion.

We reject Gudino's additional argument that the trial court erred by denying his request to use the term "legally unconscious" instead of "unconscious" and to define the term as being "not consciously aware." A word that has a technical, legal meaning must be clarified when its " ' "definition . . . differs from its nonlegal meaning." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 68, italics omitted.) But Gudino cites nothing establishing the definition of "conscious" differs from its nonlegal meaning — awareness. (Cf. *People v. Kitt* (1978) 83 Cal.App.3d 834, 841–842 [rejecting as meritless a request to provide an instruction defining "legal unconsciousness"], overruled on other grounds in *People v. Cooper* (1991)

7

53 Cal.3d 771, 836.)  And while *Mathson* sporadically used the term "legal unconsciousness" in its recommended instruction, the court did not explain the reasons doing so, nor did it impose any such requirement.  (*Mathson, supra*, 201 Cal.App.4th at p. 1323 & fn. 26.)  *Mathson* is not authority for requiring the use of the term "legally unconscious."  (*People v. Burnick* (1975) 14 Cal.3d 306, 317 ["cases are not authority for propositions not considered"].)

In sum, the unconsciousness instruction provided here was not erroneous or misleading.  Consequently, Gudino's claim the alleged error deprived him of his due process rights also fails.  (*People v. Avila* (2006) 38 Cal.4th 491, 596.)

## II.

Gudino contends the trial court erred by advising the jury at the start of jury selection there might be a second phase of the trial focused on mental health issues.  We disagree.

A defendant who enters alternative pleas of not guilty and not guilty by reason of insanity, as here, receives a bifurcated trial.  (§ 1026, subd. (a).) The first phase determines the defendant's guilt — the trial court ignores the insanity plea, and the defendant is conclusively presumed to have been sane at the time of the offense.  (*Ibid*; *People v. Elmore* (2014) 59 Cal.4th 121, 140– 141.)  If the defendant is found guilty, the case proceeds to a second phase to determine whether they were sane or insane at the time of the offense. (§ 1026, subd. (a); *Elmore*, at p. 141.)

While "there is no reason to tell [the jury], before or during the guilt phase, that the defendant is conclusively presumed sane for purposes of trial," nothing in section 1026 prohibits the trial court from informing prospective jurors about the defendant's not guilty by reason of insanity plea. (*People v. Mills* (2012) 55 Cal.4th 663, 681; *People v. Panah* (2005) 35 Cal.4th

395, 434.) Unlike *Mills*, the trial court here simply informed the jury of the bifurcated procedure due to Gudino's plea. (*Mills*, at pp. 676, 681 [error to instruct on presumption of sanity during guilt phase of bifurcated trial].) The court did not err by doing so. (*Id.* at p. 681 ["it is proper to inform the jury of the procedure specified by [section 1026]".)

To the extent Gudino contends the trial court's statement distracted the jury from determining his guilt during the first phase of trial, this argument is speculative. (*People v. Panah*, *supra*, 35 Cal.4th at p. 435.) The instructions during the guilt phase directed the jury to determine whether Gudino was guilty of murder, or whether he had the mental state required to commit that crime. Nothing in the instructions asked the jury to determine whether Gudino was sane or insane at the time of the offense. Courts assume jurors obey instructions and reserve an ultimate finding on the defendant's sanity until instructed to make that determination. (*People v. Guillebeau* (1980) 107 Cal.App.3d 531, 543 [rejecting argument jurors were unable to impartially determine defendant's guilt after learning of his not guilty by reason of insanity plea].) We do so here.

### III.

Gudino contends the trial court abused its discretion by allowing an officer to state his opinion regarding Gudino's mental health immediately after the killing. Even assuming error, it was harmless.

During trial, Officer John Cathey from the homeless outreach division testified that he responded to the 911 call and saw Gudino standing naked on the stairs, acting agitated. The prosecutor asked Cathey if he believed Gudino was in a mental health crisis. Over defense counsel's objections that the question improperly sought speculative and expert opinion testimony, Cathey testified Gudino appeared remorseful for his actions rather than

9

being in a mental health crisis.  The trial court ruled Cathey's statements were simply general propositions and observations.

We need not determine whether the trial court abused its discretion by admitting this testimony since any alleged error was harmless.  (*People v. Waidla* (2000) 22 Cal.4th 690, 725 [ruling on admissibility of evidence reviewed for abuse of discretion].)  Because Gudino fails to explain how admitting Cathey's statement rises to the level of a constitutional error, we examine prejudice under the standard in *People v. Watson* (1956) 46 Cal.2d 818 — whether "it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error."  (*Id.* at p. 836; *People v. Partida* (2005) 37 Cal.4th 428, 439 [erroneous admission of evidence results in a due process violation only if it renders the trial fundamentally unfair]; *People v. Son* (2020) 56 Cal.App.5th 689, 698 [determining whether to reverse for evidentiary error assessed under the *Watson* standard].)  No prejudice appears.

The challenged testimony was cumulative of other evidence in the record, including additional testimony by Cathey and body camera footage of his interactions with Gudino.  (*People v. Ledesma* (2006) 39 Cal.4th 641, 709 [erroneous admission of statements harmless where it is cumulative of other evidence].)  Cathey testified without objection regarding his daily experience interacting with people exhibiting symptoms of mental health crisis.  He explained people experiencing such crises generally exhibit signs of paranoia, hearing voices, or beliefs that people are placing devices in their heads. According to Cathey, communication with a person experiencing a mental health crisis is difficult and requires repeating questions to elicit any answer. Gudino, according to Cathey, was able to answer questions regarding his identity and to provide information about other individuals in his house.  He

10

was cooperative, waited for Cathey's responses, and appropriately communicated with him. The challenged testimony simply summarized these observations.

The jury could also draw its own conclusions from the footage admitted into evidence documenting the interaction with Gudino. Officers were recorded trying to calm Gudino, who believed the officers were going to shoot him. Despite the chaos surrounding the arrest of a naked and blood-covered suspect, Gudino was responsive to questions regarding the spelling of his name and his date of birth. He gave officers information about his sister, who was in the home, and his mother, including her date of birth, without Cathey needing to repeat any questions. Gudino repeatedly made statements demonstrating remorse — "Fuck," "Fuck. Why did I kill my fucking mom," "Why did I fucking do that?" and "I'm—I'm so fucking sorry."

We reject the related assertion that the prosecutor's closing argument emphasized Cathey's testimony Gudino was not in a mental health crisis. The prosecutor simply repeated *Gudino's* comments acknowledging he killed his mom and questioning his own actions —statements documented in the video. Had Cathey's challenged statement been excluded, there is no reasonable probability of a different result. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

IV.

Gudino contends the prosecutor committed misconduct during closing arguments by misleading the jury about her efforts to exclude evidence and by attacking defense counsel's integrity. We agree there was misconduct, but conclude it was not prejudicial.

Convictions must be reversed for egregious prosecutor misconduct if the conduct so infected a trial with such unfairness, any resulting conviction

11

violates due process.  (*People v. Flores* (2020) 9 Cal.5th 371, 403.)  Misconduct that does not reach that level may nonetheless violate state law " 'if it involves the use of deceptive or reprehensible methods to persuade the court or jury.' "  (*People v. Armstrong* (2019) 6 Cal.5th 735, 795.)  While claims of misconduct are reviewed for abuse of discretion, we independently examine the law and objectively examine how a reasonable juror would interpret the prosecutor's remarks.  (*People v. Collins* (2021) 65 Cal.App.5th 333, 340.)

Gudino presented expert testimony from a neuropsychologist who conducted an exam of Gudino three times over the course of nine hours.  The expert diagnosed Gudino with schizoaffective disorder and concluded his actions the day of the killing were consistent with a person with an impaired perception of reality and with someone who lacked awareness of his actions.  On cross-examination, the prosecutor challenged the expert's forensic psychology credentials — she was not board certified in forensic psychology, her postdoctorate work was not related to forensic psychology, her forensic psychology training primarily consisted of taking approximately 10 continuing education courses, and the few criminal cases she testified in were only on behalf of defendants.

During closing argument, the prosecutor made the following statement:

> [The defense] rushed out and paid $5,000 for a psychologist lacking in any meaningful forensic experience, and who has found as her new hobby to testify that criminal defendants charged with murder lack, for one reason or another, the intent to kill when they commit murder, to draft a report and to come in here and testify that you should believe Daniel Gudino when he said on April 12th that he was not conscious, but their job is not to seek justice or to tell the truth about what happened to [Gudino's mother] on April 12, 2020.

In addition, the prosecutor argued "the defense's obligation is to their client; and by any means necessary they seek to have him acquitted of these charges, even if that means using bias, uninformed and untruthful witnesses."

Finally, during the trial, Gudino's counsel sought unsuccessfully to admit Gudino's psychiatric records, which included statements by his family. The prosecutor objected, noting the records contained hearsay statements, including of the victim. The prosecutor emphasized those statements, such as accounts of Gudino's acts towards her, would actually assist the prosecution's case. Nonetheless, the prosecutor stated it may not be appropriate to allow "the admission of statements by somebody who cannot testify nor be cross-examined."

During her closing argument, Gudino's counsel repeatedly questioned the prosecutor's failure to present witnesses who knew about Gudino's character or his relationship with his mother. Counsel noted the prosecutor "could have brought in witnesses to say that [Gudino and his mother's relationship] was a bad relationship if they existed, but she didn't." In response, the prosecutor argued, "we all know that [Gudino's mother] can't take that stand. Everything that [Gudino's mother] ever said has been excluded from this trial."

None of these remarks resulted in a fundamentally unfair trial or created a reasonable probability of a more favorable result if they had not been made.

First, we find no misconduct in the prosecutor's statement about Gudino's expert witness. Counsel has wide latitude to argue the credibility of witnesses, including " '[h]arsh and colorful attacks on the credibility of opposing witnesses.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 442; *People v.*

13

*Valencia* (2008) 43 Cal.4th 268, 305.) Indeed, counsel may remind jurors or argue, "from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent 'lie.' " (*People v. Arias* (1996) 13 Cal.4th 92, 162.) This includes arguments that experts are biased because of their compensation and being paid by the defense. (*People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1272.) The prosecutor's statement here permissibly challenged the expert's credibility based on self-interest, compensation, and lack of forensic experience.

Next, the prosecutor's statement — "we all know that [Gudino's mother] can't take that stand. Everything that [she] ever said has been excluded from this trial" — presents a closer question. While " 'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements,' " it appears the statement could have left the jury with the impression that the prosecutor would have offered the victim's statements into evidence had defense counsel not obtained their exclusion, and further, that such exclusion was sought because the evidence would be damaging to defendant. (*People v. Gurule* (2002) 28 Cal.4th 557, 657; *People v. Martinez* (2010) 47 Cal.4th 911, 957.) So interpreted, the statement would be deceptive and misleading, and thus improper. (*People v. Armstrong, supra*, 6 Cal.5th at p. 795.)

Nevertheless, even assuming misconduct, no prejudice appears. Courts have determined that an isolated incident of misconduct in a closing argument that otherwise focused on admitted evidence is not prejudicial. (*People v. Rivera* (2019) 7 Cal.5th 306, 335.) The prosecutor's suggestion that she was precluded from introducing the victim's statements was such an isolated instance. She explained her reason for not presenting testimony from Gudino's immediate family and instead asked the jury to focus on

14

testimony provided by Gudino's neighbor. That neighbor described Gudino's aggressiveness towards his mother: she heard Gudino arguing with his mother a few times each month — occasionally threatening her and yelling profanity — and with police and emergency personnel responding to calls at Gudino's house. The jury was further instructed closing arguments did not constitute evidence. (*Ibid.* [harmless error from prosecutorial misconduct when, in part, jurors are properly instructed on how to consider attorney statements during closing argument].)

Finally, we agree the prosecutor engaged in misconduct when she said it was not defense counsel's job "to seek justice or to tell the truth about what happened," and "the defense's obligation is to their client; and by any means necessary they seek to have him acquitted of these charges, even if that means using bias, uninformed and untruthful witnesses." Prosecutors are prohibited from making "false or unsubstantiated accusations that counsel is fabricating a defense or deceiving the jury." (*People v. Clark* (2011) 52 Cal.4th 856, 961.) And it is generally improper, as the prosecutor did here, "to imply that counsel is free to deceive the jury." (*People v. Bemore* (2000) 22 Cal.4th 809, 846.) Rather than simply arguing defense counsel's witnesses presented untruthful, biased, and uninformed opinions, the prosecutor faulted defense counsel for essentially presenting a fabricated defense, one that defense counsel knew was false. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1337.)

But on this record, the misconduct was not prejudicial. It does not appear the prosecutor's statements were part of a strategy to inflame the jury, but rather to undermine the defense witnesses. The bulk of the closing argument focused on the credibility and veracity of Gudino's witnesses, a legitimate method of attack. (*People v. Pearson*, *supra*, 56 Cal.4th at p. 442.)

15

Disparaging defense counsel was improper, but collateral. The identified portion of the prosecutor's argument "was relatively brief, and especially when viewed in context, hardly so inflammatory as to distract the jury from a thorough and reasoned evaluation of the evidence." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 61.) It is not reasonably probable the jury would have reached a more favorable result in the absence of the identified statements.

V.

Gudino contends the trial court abused its discretion by admitting a photo of the victim at the crime scene. We disagree.

Before trial, Gudino's counsel moved to preclude the prosecution from introducing a photo of the victim's body at the crime scene. The photo provided a full picture of the victim's bedroom, and it omitted some graphic details, such as scattered brain matter and the victim's partial nudity below the waist. Gudino's counsel argued the same information could be conveyed through officer observations, and the photos were far more prejudicial than probative. The prosecutor countered that the photo allowed the jury to evaluate whether Gudino's statements to police describing the killing — that Gudino choked and hit his mother with a baseball bat while she was on the floor, burned her body, and used a drill to drill into her body — were consistent with the actual crime scene. The purpose, the prosecutor argued, was to rebut Gudino's defense that he was unconscious of his actions. The trial court ruled the photo relevant and found its probative value was not outweighed by prejudice.

Generally, all relevant evidence — that is, evidence that has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" — is admissible. (Evid. Code, §§ 210, 351.) Relevant evidence may be excluded if the trial court determines

16

the probative value is substantially outweighed by the probability its admission will create substantial danger of undue prejudice. (*Id.*, § 352.) Those determinations are reviewed for an abuse of discretion. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

Gudino argues admitting the photo was unnecessary because it was unpleasant, unduly gruesome, and repetitive of testimony already presented by other witnesses, such as the testimony of a medical examiner who assessed the extent of the victim's injuries. But the gruesome nature of the photo did not require the trial court to exclude them from evidence. Pictures of murder are always unpleasant. (*People v. Pierce* (1979) 24 Cal.3d 199, 211.) The "admission of photographs alleged to include disturbing details is essentially a relevance question, over which trial courts retain considerable discretion." (*People v. Perez* (2018) 4 Cal.5th 421, 457.) This is true even where the photo is "cumulatively used to graphically portray injuries already detailed in the testimony of a doctor witness." (*People v. Marsh* (1985) 175 Cal.App.3d 987, 998.)

The photo admitted here is distinguishable from those admitted in *Marsh*. In that case, the court concluded autopsy photos displaying the two-year-old victim's exposed brain and dangling bloody scalp, blood-splattered torso with the "ribcages rolled back to expose the bowels" and projected onto a screen in vivid color were gruesome because they depicted the autopsy surgeon's actions, not the injuries inflicted on the child. (*People v. Marsh, supra,* 175 Cal.App.3d at pp. 996–997, 999.) Here, the photo offered a direct and detailed view of the victim at the crime scene, not an autopsy. (*Id.* at pp. 997–998 ["Autopsy photographs have been described as 'particularly horrible,'" and inflame the jury when their viewing has no particular value]; *People v. Pride* (1992) 3 Cal.4th 195, 243–244.) The photo depicted one side of

17

the crime scene room and excluded portions of the victim's body, such as her partial nudity below the waist and scattered brain matter. The photo was probative of whether Gudino was conscious during the killing — whether the details he remembered and conveyed to officers were consistent with the crime scene. Though unsettling, any danger of undue prejudice from the photo did not substantially outweigh its probative value. The trial court did not abuse its discretion by admitting it into evidence.

## VI.

Gudino argues the cumulative effect of the alleged errors at trial warrant reversal of the judgment. (*People v. Williams* (2009) 170 Cal.App.4th 587, 646 [reviewing each alleged error to determine cumulative effect and whether jury would have rendered more favorable verdict in their absence].) Not so. Of the errors assumed or identified — admission of lay opinion testimony and prosecutorial misconduct — both were harmless. Gudino has not demonstrated cumulatively prejudicial error.[2]

## VII.

Gudino argues, and the People concede, the trial court erroneously ordered him to pay the following fees: $240 under section 1202.4, for victim restitution of economic loss when a defendant is convicted of the relevant crime; $40 under section 1465.8, for a court operation assessment imposed on every conviction for a criminal offense; and $30 under Government Code section 70373, for court facilities funding imposed for every conviction for a criminal offense. We agree. Gudino was not convicted of any offense — a

---

[2] In light of this conclusion, we do not address Gudino's request that if the judgment is reversed, the prosecution is foreclosed from retrying the sanity phase due to its stipulation that he is not guilty by reason of insanity.

finding of not guilty by reason of insanity is not a conviction. (*People v. Morrison* (1984) 162 Cal.App.3d 995, 998.) Accordingly, we strike these identified fines and fees.

## DISPOSITION

The restitution fund fine, court operation fee, and court facilities fee are stricken. The judgment is otherwise affirmed.

_____
Rodríguez, J.

WE CONCUR:

_____
Tucher, P. J.

_____
Petrou, J.

A163496